TIMBERS, Senior Circuit Judge.
 

 Appellants Irwin August and Kathleen Bogoff appeal from judgments of conviction entered June 28, 1983 after a seven week jury trial in the Eastern District of Michigan, Ralph M. Freeman, District Judge.
 

 During the period covered by the indictment, August was a Detroit attorney who specialized in bankruptcy matters; Bogoff was a bankruptcy court “intake clerk”. The crimes of which they were convicted involved a scheme to circumvent the blind draw case assignment system operated by the bankruptcy court clerk’s office in Detroit so that very few of August’s Chapter 11 bankruptcy cases would be assigned to a particular bankruptcy judge.
 

 Both August and Bogoff were convicted of conspiring to defraud the United States of the due administration of justice, in violation of 18 U.S.C. § 371 (1982) (Count One). Both were convicted of impeding the due administration of justice by manipulating the blind draw system in the bankruptcy court, in violation of 18 U.S.C. § 1503 (1982) (Count Two). August was convicted of attempting to influence Bogoff in the discharge of her official duties as a court clerk, in violation of 18 U.S.C. § 1503 (1982) (Count Three).
 
 [1]
 
 August was sentenced to
 
 *402
 
 three concurrent two-year prison terms on each of the counts upon which he was convicted. Bogoff was sentenced to two concurrent one-year prison terms on each of the counts upon which she was convicted. Both appellants are at liberty on bail pending appeal.
 

 The chief issue raised on appeal relates to the district court’s reference in the presence of the jury, on the last day upon which testimony was taken, to a prior ruling concerning the admissibility of hearsay statements made by a co-conspirator. Other subordinate claims of error are raised.
 

 For the reasons stated below, we affirm the judgments of conviction of both appellants on all counts upon which they were convicted.
 

 I.
 

 We shall summarize those facts and prior proceedings believed necessary to an understanding of our rulings on the issues raised on appeal.
 

 The relevant period of time is that covered by the counts of the indictment related to this appeal — from October 3, 1979 to October 30, 1980. During this period, three bankruptcy judges sat in the Eastern District of Michigan, Southern Division: Judge Hackett, Judge Brody, and Judge Patton. Judge Patton took all of the Chapter 13 cases. A blind draw system was designed to assign to him approximately 30% of the Chapter 7 and Chapter 11 cases. The system was operated by using decks of 100 3"X5". index cards, each typically containing 30 marked for Judge Patton and 35 marked for each of Judges Brody and Hackett. The cards were shuffled, numbered, and sealed on three sides so that the judge’s name was not visible. In eighteen of the seventy-two packs used while Bogoff was an intake clerk, the order of the cards was adjusted so that no two cards bearing the same judge’s name were next to each other; in other cases, the cards were randomly mixed. When a bankruptcy petition was filed, the intake clerk removed the top card from a judge assignment deck, turned it over to-reveal the name of the judge to whom the case was assigned, and stamped that judge’s name on the petition.
 

 August’s law firm filed about one-half of the Chapter 11 cases in the Eastern District of Michigan during the period here involved. August had a romantic relationship during this period with intake clerk Bogoff.
 
 [2]
 
 Although she was not the only clerk in the office and filed only about half of all bankruptcy petitions, she arranged matters so that she handled almost all of the judge assignments in cases involving August’s firm. She allowed members of that firm to come behind the counter to drop off filings without waiting in line. She permitted August to leave on her desk his briefcase containing filings.
 

 The government’s theory was that Bo-goff would take several petitions to the counter, draw a card and look at the judge’s name. If Judge Patton’s or Judge Hackett’s name appeared, she would file the Chapter 11 petition presented by the August firm.
 
 [3]
 
 Sixty-eight Chapter 11 eases were filed by August’s firm during this period, of which 92% were handled by Bogoff and only nine initially were assigned to Judge Brody. If multiple petitions were filed involving the same parties, the cases were eventually consolidated and assigned to the judge to whom the first of
 
 *403
 
 the petitions had been assigned. After consolidations, only four Chapter 11 cases filed by the August firm remained assigned to Judge Brody.
 
 [4]
 

 At trial, the government adduced circumstantial evidence that it was possible to manipulate the blind draw system; that Bogoff had filed almost all of August’s cases; and that a disproportionately low percentage of August’s cases were assigned to Judge Brody. Professor David Doane, an expert statistician, testified that there was a 99.97% chance that more August cases would have been assigned to Judge Brody if the blind draw system were truly random.
 

 The chief issue raised on appeal, referred to above, arose during the government’s examination of rebuttal witness Ronald Mellish (chief deputy clerk of the bankruptcy court) on the last day of testimony. A question was asked concerning a conversation between Bogoff and the witness. Counsel for August objected to the question on the ground that it called for an answer which would be hearsay as to August.
 
 [5]
 
 In addressing this objection, the court stated, “Well, as to count one I have ruled on that, I think, as to the conspiracy time, and I have made findings earlier out of the presence of the jury that the conspiracy existed and that the defendants were members of the conspiracy, including Mr. August, and that any statement made at that time [January of 1980] would be in furtherance of the conspiracy.”
 
 [6]
 
 At this point, government counsel started to make a comment, but the court added, “I am talking now about the admissibility of evidence.”
 

 Counsel for August asked to make an application outside the presence of the jury. The jury left the courtroom at 11:25 a.m. Counsel for August then requested a mistrial, arguing that no corrective instruction or charge could remove the prejudice resulting from the court’s comment. The court denied the motion for a mistrial. It agreed, however, at counsel’s request, to instruct the jury that the court makes certain evidentiary rulings concerning what evidence is admissible and what evidence the jury may consider; that the court’s remarks were directed solely to the issue of the admissibility of evidence and not to the factual determination; and that it is left solely to the jury to determine whether or not a Conspiracy existed and who were the members.
 

 A recess was taken, during which the court conferred with counsel regarding the language of the proposed cautionary instruction. Counsel took exception only to the court’s reciting in substance the remarks which occasioned the motion for a mistrial. In accordance with counsel’s request, these remarks were not repeated to the jury. The jury was brought back in at 1:49 p.m. The court then gave the jury the following cautionary instruction:
 

 “THE COURT:
 

 I would like to say that during the direct examination of the Government’s rebut
 
 *404
 
 tal witness, Mr. Mellish, Mr. Reisig asked the witness to relate a conversation he had had with the Defendant Bogoff, to which Mr. Krieger objected to it being hearsay as to the Defendant August.
 

 At that time I indicated I had previously ruled on the issue and made certain remarks about the conspiracy charge.
 

 I want to caution you that I was only ruling on the admissibility of the evidence as I am required to do out of the presence of the jury. I instruct you now to completely disregard my statements. My finding was made only with and in connection with an issue concerning the admission of certain evidence, applying principles of law with which you need not concern yourselves. Those principles of law which I apply in ruling on the admissibility of evidence at this stage of the trial are different than the principles that I will instruct you on at the end of the trial to apply in determining the guilt or innocence of the defendants.
 

 I emphasize to you that the question of whether a conspiracy existed and whether Mr. August or Miss Bogoff were members of the conspiracy are questions of fact for you to decide based on all of the evidence in the case.
 

 You are the sole judges of those questions of fact, and as I stated at the outset of this trial and as I will instruct you at the end of this trial, the defendants are presumed to be innocent until their guilt is proven beyond a reasonable doubt.
 

 Now, is there any one of you who would not be able to completely disregard those remarks made by the Court that I have referred to?”
 

 (No response from the jury.)
 

 “THE COURT: No one has responded to that. So, I assume you can completely disregard those remarks.
 

 Is there any one who feels that he or she could not apply the instructions as given by the Court at the conclusion of the case in light of the remarks which I have made and to which I made reference? All of you feel that you could, then, apply the instructions to be given to you by the Court at the conclusion of the case regardless of any remarks I made at the time and immediately following the objection made by Mr. Krieger to the question made by Mr. Reisig to the witness? You all agree to that? All right.”
 

 The court recessed for lunch.
 

 The above episode occurred on the last day of testimony of a seven week trial which began on March 22, 1983 and concluded on May 2. The court’s cautionary instruction, set forth above, was given on a Monday. There followed the usual motions and summations. The court charged the jury on Thursday. The jury began its deliberations that day and returned its verdict the following Monday. No exceptions were taken by appellants’ counsel to the cautionary instruction as given or to the charge. Their position is that
 
 no
 
 instruction or charge could have rendered the error harmless and that a mistrial should have been granted.
 

 From the judgments of conviction entered June 28, 1983, this consolidated appeal has been taken.
 

 II.
 

 We turn directly to a consideration of the trial court’s reference to its prior finding that a conspiracy existed and that appellants were part of it. In the light of our views expressed in
 
 Vinson, supra
 
 note 6, all parties, including the government, agree that this unfortunate remark was error. The specific issue before us is whether it constituted reversible or harmless error.
 

 In
 
 Vinson,
 
 the district court admitted testimony describing out-of-court statements which tended to incriminate defendant Thompson, but instructed the jury that the hearsay could not be considered “until you are satisfied or the Court makes a ruling of a prima facie case of conspiracy.” 606 F.2d at 151. Later in the trial, the court made a preliminary finding that the government had proved that a conspiracy between defendants Yinson and Thompson had been established by a preponderance of the evidence. The court admitted co-con
 
 *405
 
 spirator hearsay and told the jury that its earlier admonition not to consider such evidence was no longer in effect. On appeal, although we affirmed the judgments of conviction, we stated that the trial judge
 

 “should refrain from advising the jury of his findings that the government has satisfactorily proved the conspiracy. The judge should not describe to the jury the government’s burden of proof on the preliminary question. Such an instruction can serve only to alert the jury that the judge has determined that a conspiracy involving the defendant has been proven by a preponderance of the evidence. This may adversely affect the defendant’s right to trial by jury. The judge’s opinion is likely to influence strongly the opinion of the individual jurors when they come to consider their verdict and judge the credibility of witnesses.”
 

 Id.
 
 at 153 (footnote omitted).
 

 We are mindful that “conspiracy” is a particularly prejudicial word,
 
 United States v. Legato,
 
 682 F.2d 180, 183 (8th Cir.),
 
 cert. denied,
 
 459 U.S. 1091 (1982), and that a jury may give great weight to a judge’s remarks, even if told it should disregard them.
 
 Quercia v. United States,
 
 289 U.S. 466, 470 (1933);
 
 Vinson, supra,
 
 606 F.2d at 153. Nevertheless, under carefully delineated circumstances, this type of inadvertent remark has been held to be harmless error.
 
 See, e.g., United States v. Legato, supra,
 
 682 F.2d at 183;
 
 United States v. Lord,
 
 565 F.2d 831, 841 (2d Cir.1977). As stated above, we affirmed the convictions in
 
 Vinson,
 
 holding that the court’s comments, while error, were not prejudicial.
 

 In evaluating the impact of the remarks in question in the instant case, there are several important factors to consider. First is the court’s strong curative instruction. Curative instructions have been held to limit or eliminate the damage when the jury learns about preliminary conspiracy findings.
 
 E.g., United States v. Davis,
 
 679 F.2d 845, 855 (11th Cir.1982),
 
 cert. denied,
 
 103 S.Ct. 1198 (1983).
 
 See also United States v. Richman,
 
 600 F.2d 286, 296 (1st Cir.1979). Immediately after the remarks were made in this case, the court told the jury that it was referring only to the admissibility of evidence. Later, the court gave a comprehensive curative instruction which emphasized that the remarks in question (but without repeating them) should be totally disregarded; that different principles are applied in determining the admissibility of evidence than in determining guilt or innocence; that the question of whether a conspiracy existed and whether the defendants on trial were members of it were questions of fact for the jury to decide based on all of the evidence; that the jury is the sole judge of the facts; and that the defendants are presumed innocent unless proven guilty beyond a reasonable doubt. It would be hard to think of a stronger, more precise, curative instruction than that given in this case — so much so that no exception was taken to it.
 

 Appellants rely on
 
 Quercia, supra,
 
 and
 
 United States v. Murdock,
 
 290 U.S. 389 (1933), for the proposition that curative instructions are insufficient. In
 
 Quercia,
 
 the judge told the jury that it could disregard his opinion but that he thought that everything the defendant had said was a lie. In
 
 Murdock,
 
 the judge told the jury that it could disregard his opinion but that he thought the defendant was guilty beyond a reasonable doubt. Both convictions were reversed. These cases quite obviously are distinguishable. The judges in
 
 Quercia
 
 and
 
 Murdock
 
 stood by their opinions (although allowing the jury to disagree); in the instant case, the court told the jury that it
 
 must
 
 disregard the court’s remarks. Furthermore, in
 
 Quercia
 
 and
 
 Murdock
 
 the judges’ comments went directly to the matter of guilt; in the instant case, the court explained to the jury that the preliminary ruling concerned only the admission of evidence and was governed by entirely different principles than those that determine guilt or innocence. The court quite properly did not explain the government’s burden of proof on the evidentiary ruling.
 

 Second, in considering the impact of the court’s remarks, an important factor is the
 
 *406
 
 court’s questioning of the. jury concerning its ability to disregard the court’s remarks about the preliminary finding and to follow the curative instruction as well as the court’s charge at the conclusion of the case. The jury indicated that it would be able to disregard completely the court’s remarks and to obey the curative instruction as well as the charge.
 
 [7]
 
 The court had lived with this jury for six weeks and was in the best position to assess the likelihood that it would follow the curative instruction. In short, the trial judge was there; we were not. We give substantial weight to the court’s assessment of the impact on the jury of the remarks in question.
 

 Third, the final charge is an important factor in assessing whether the error was harmless or otherwise. We have held that a proper charge can cure confusion resulting from comments made at trial. In
 
 Vinson, supra,
 
 606 F.2d at 152, we held that:
 

 “Moreover, any confusion which might have been caused by the trial judge’s comments to the jury was cured by his final conspiracy instruction in which the elements of a criminal conspiracy and the government’s burden of .proof were clearly and correctly stated.”
 

 In
 
 Legato, supra,
 
 682 F.2d at 183, the combination of a prompt curative instruction and a proper charge rendered the error harmless. Here the court carefully set forth in its final charge the law applicable to the offense of conspiracy, presumption of innocence and burden of proof. Appellants admit that the charge in all respects was correct. They took no exceptions.
 

 Fourth, a final factor to be considered is the context of the trial in which the remarks were made.
 
 Kotteakos v. United States,
 
 328 U.S. 750, 762-64 (1946). This was a lengthy trial in which many witnesses were called and numerous evidentiary rulings were made. The jury frequently was sent out of the courtroom — often for long periods of time. Although the remarks in question were made on the last day of the testimony, the jury was not charged and did not begin its deliberations until three days later. Moreover, while the evidence was largely circumstantial, there was substantial evidence of guilt. We are satisfied that the likelihood that the remarks in question influenced the jury is very slight.
 
 United States v. Lord, supra,
 
 565 F.2d at 841. The court here, in a careful, comprehensive opinion on this matter dated June 28, 1983, made a specific finding that any possible prejudice that could have resulted from the remarks in question was far outweighed by substantial evidence of guilt.
 

 The court, in short, was required to make a judgment call as to whether to grant a mistrial at the end of a seven week trial or to minimize the impact of the remarks with a strong curative instruction, voir dire of the jury and a proper final charge. We believe that this experienced, conscientious trial judge made the correct decision under the circumstances of this case in choosing the latter course.
 
 [8]
 

 We conclude that there was no substantial risk that the jury’s verdict was influenced by the remarks in question. We hold that they constituted harmless error.
 

 III.
 

 This brings us to the only other claim of error which we believe warrants brief discussion in this opinion.
 

 The court allowed an expert statistician to testify about several matters, including the mathematical probability that, absent manipulation of the blind draw system, Judge Brody would have been assigned to 9 or fewer of the 68 Chapter 11 cases filed by August’s firm during Bogoff’s tenure
 
 *407
 
 as intake clerk. Dr. Doane testified that the odds were 3,685 to 1 against that occurrence, and that the odds remained over 99 to 1 that Judge Brody should have received more Chapter 11 cases even if, as defendants alleged, members of August’s firm waited outside the Bankruptcy Clerk’s window until Judge Brody’s card came up in another case. Appellants argue that the probative value of this testimony was outweighed by its prejudicial effect and that it therefore should have been excluded under Fed.R.Evid. 403.
 

 The decision to allow a witness to testify as an expert pursuant to Fed.R. Evid. 702
 
 [9]
 
 is left to the sound discretion of the trial judge and will not be disturbed on appeal absent a showing that the ruling was clearly erroneous or an abuse of discretion.
 
 Mannino v. International Manufacturing Co.,
 
 650 F.2d 846, 849 (6th Cir.1981). We hold that the court here properly exercised its discretion in allowing Dr. Doane’s testimony.
 

 In the instant case, there was no direct evidence of guilt. No one testified to having observed any tampering with the judge selection cards. No one confessed to having subverted the process. The government’s case consisted of a showing of motive and opportunity, coupled with circumstantial evidence that a disproportionately small number of August’s cases were being assigned to Judge Brody. To convict, the jury had to find that the process was not working in the intended random fashion. To this end, expert testimony was highly probative and appropriate to assist the jury in interpreting the statistical significance of the distribution. Although a layman would notice the discrepancy where a judge who received 36% of overall case assignments presided over only 4 of the 68 eases filed by August’s firm, expert testimony was critical to refute the defense theories advanced as innocent explanations for this result.
 

 The court instructed the jury that it was to determine the weight and credibility to be given to this testimony. We find no basis for finding the expert “usurped the role of the jury”.
 
 [10]
 
 Rather, the expert testimony merely rendered assistance to the trier of fact in interpreting the raw data already before it.
 

 We hold that the expert testimony was properly admitted.
 

 We have carefully considered appellants’ other claims of error and we hold that they are without merit.
 
 [11]
 

 Appellants were convicted after a seven week jury trial more than a year ago of serious crimes committed during a period beginning almost five years ago. We order that the mandate issue forthwith.
 

 Affirmed.
 

 [1]
 

 . Bogoff was acquitted at the instant trial of accepting illegal gratuities from August, in violation of 18 U.S.C. § 201(g) (1982) (Count Four). August was acquitted at a prior trial in November 1982 of bankruptcy fraud, in violation of 18 U.S.C. § 152 (1982) (Counts Six and Seven). Count Five, which charged August with obstructing justice by attempting to influence a
 
 *402
 
 bankruptcy judge, in violation of 18 U.S.C. § 1503 (1982), was dismissed by the government in August 1983.
 

 [2]
 

 . August contributed significantly to Bogoff's support. In 1980, he deposited directly into her personal bank account checks from his law firm clients totalling more than $11,000.
 

 [3]
 

 . Defendants’ theory was that members of August's firm would wait outside the intake window until Judge Brody was assigned to another case, then step up to the window, assuming that no judge’s name appeared on two consecutive cards. But only eighteen of the seventy-two decks used while Bogoff was an intake clerk were arranged so that no judge’s name appeared twice in sequence. This theory was refuted conclusively at trial on a number of grounds, including the fact that the mathematical odds against Judge Brody’s assignment to so few August cases were 99 to 1
 
 even if
 
 members of the firm behaved in the manner appellants suggest.
 

 [4]
 

 . August considered Judge Brody a difficult judge before whom to practice. Specifically, August thought that Judge Brody awarded smaller attorney fees. In 1978, August told Judge Brody in chambers that he could not afford to handle such cases if Judge Brody continued to reduce his fee awards so much. He asked Judge Brody to transfer all of the August firm cases to which Judge Brody had been assigned to Judge Hackett (a personal friend of August). Judge Brody refused to do so.
 

 [5]
 

 . The hearsay objection was based on the claim that the proffered statement was not in furtherance of the conspiracy. This objection ultimately was sustained.
 

 [6]
 

 .The court was referring to the preliminary showing which must be made before the government may avail itself of the co-conspirator exception to the hearsay rule under Fed.R. Evid. 801(d)(2)(E). The government must establish by a preponderance of the evidence "(1) that a conspiracy existed, (2) that the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) that the hearsay statement was made in the course and in furtherance of the conspiracy.”
 
 United States
 
 v.
 
 Vinson,
 
 606 F.2d 149, 152 (6th Cir.1979),
 
 cert. denied,
 
 444 U.S. 1074 (1980) (defendant Vinson), ce
 
 rt. denied,
 
 445 U.S. 904 (1980) (defendant Thompson).
 
 See United States v. Enright,
 
 579 F.2d 980 (6th Cir.1978).
 

 [7]
 

 . If counsel had requested an individual voir dire of the jurors — out of the presence of each other — the court undoubtedly would have granted it.
 

 [8]
 

 . It so happens that each of the three members of the panel of this Court deciding the instant appeal has had considerable experience on the trial court. We have some appreciation of the difficulty involved in making the type of judgment call which Judge Freeman made in the instant case.
 

 [9]
 

 . Fed.R.Evid. 702 provides:
 

 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”
 

 See also United States
 
 v.
 
 Green,
 
 548 F.2d 1261 (6th Cir.1977).
 

 [10]
 

 . Contrary to appellants’ assertion at oral argument, expert testimony is not objectionable on the ground that it embraces the ultimate issue of fact.
 
 United States v. Barrett,
 
 703 F.2d 1076, 1084 n. 14 (9th Cir.1983);
 
 Moore v. Wesbar Corp.,
 
 701 F.2d 1247, 1253 (7th Cir.1983);
 
 United States
 
 v.
 
 Kelly,
 
 679 F.2d 135, 136 (8th Cir.1982) (per curiam).
 

 [11]
 

 .Appellants’ other claims of error, which we hold are without merit, assert that Counts One, Two and Three of the indictment failed to charge offenses under the respective statutes.