**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Paul B. MURPHY,**
**Defendant–Appellant.**

**No. 90–5648.**

United States Court of Appeals,
Sixth Circuit.

Argued March 15, 1991.

Decided June 19, 1991.

William Sonnenberg, Gary Humble, Asst. U.S. Attys., Chattanooga, Tenn., John W. Gill, Jr., U.S. Atty., Knoxville, Tenn., Carolyn Mark, Staff Atty. Argued, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for U.S.

John R. Bode, Edward N. Boehm, Miller & Martin, Chattanooga, Tenn., Timothy M. Broas Argued, Richard A. Hibey, Steven M. Alderton, Anderson, Hibey, Nauheim & Blair, Washington, D.C., for defendant-appellant.

Before MARTIN and MILBURN, Circuit Judges, and ENGEL, Senior Circuit Judge.

MILBURN, Circuit Judge.

Defendant-appellant Paul B. Murphy appeals the summary judgment granted in favor of plaintiff-appellee the United States of America in this civil action filed under the False Claims Act, 31 U.S.C. §§ 3729–3733, to recover for the rigging of bids submitted by electrical contractors on the Moccasin Bend Wastewater Treatment project in Chattanooga, Tennessee. For the reasons that follow, we reverse.

I.

After one attempt to appeal was dismissed by this court on November 3, 1989, Murphy perfected a timely appeal follow-

ing the denial of a timely motion for reconsideration by the district court. The proceedings below included Murphy's employer, Fischbach and Moore, Incorporated ("Fischbach"). Murphy was Fischbach's southern division president at all times relevant to this appeal.

In granting summary judgment on May 31, 1989, the district court held Murphy and Fischbach jointly and severally liable. Fischbach originally appealed along with Murphy but dismissed its appeal prior to oral argument.

Fischbach was convicted by a jury on an indictment charging a conspiracy to restrain trade in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, arising out of a meeting by representatives of Fischbach and Commonwealth Electric at the Read House Hotel in Chattanooga, Tennessee, on June 5, 1980. The indictment charged that representatives of the two companies reached an agreement whereby Commonwealth was to submit the low bid to the prime contractor on the Moccasin Bend project in Chattanooga and Fischbach was to submit a slightly higher bid. The indictment charged that both bids were to be artificially inflated and Fischbach was to be compensated, either by monetary payoff or by cooperation from Commonwealth on future bids. Commonwealth secured a contract with the winning prime contractor, Blount Brothers, Inc.

At the criminal trial, particularly damaging evidence against Fischbach came from Bernard Trepte, Fischbach's Atlanta district manager. Trepte testified that acting for the benefit of Fischbach, he met with his counterpart from Commonwealth and entered into the agreement charged in the indictment. Trepte also testified that the meeting took place with the knowledge and encouragement of his supervisor, defendant Murphy.

Murphy also testified in the earlier proceedings and acknowledged that Fischbach had participated in bid rigging in the past and that he had been personally involved in some of those schemes. Murphy also acknowledged that he had talked with Trepte about the Moccasin Bend project. Murphy admitted that he talked to Phillip Mahoney, Murphy's counterpart at Commonwealth, prior to the Read House meeting; however, Murphy claimed that he was only interested in determining whether Commonwealth was genuinely interested in bidding the Moccasin Bend project. When challenged on cross-examination, Murphy admitted that he recalled Mahoney stating, "Yes, why don't you stay out of that and let those guys at the job site handle any arrangement they are going to have." J.A. 717.

Murphy's testimony also indicated that he told Trepte "something … like whatever you are going to do up there you are doing it on your own, I'm not involved in it." When asked what this statement meant, Murphy responded, "Well, we obviously were facing a situation where there were only going to be two or three bidders, so if there was any thought of bid rigging going on, then he has a good chance to do it, I suppose." J.A. 715. Murphy admitted that he saw Trepte at a convention in Hawaii approximately one week after the bids were opened. Murphy then learned that Trepte had "reached some sort of an accommodation with Commonwealth." J.A. 721.

Later, in opposition to the government's motion for summary judgment, Murphy submitted his own affidavit asserting that (1) Trepte handled the entire bidding process on the Moccasin Bend project without approval, supervision, or direction from Murphy; (2) if the word arrangement was used in his conversation with Mahoney, Murphy did not understand it to refer to illegal bid rigging; (3) no agreement was reached in the telephone conversation between Mahoney and Murphy; and (4) Murphy told Trepte that he was "on his own," not out of bid rigging concerns, but as an implicit warning to submit an adequate bid. Murphy also submitted deposition testimony to the effect that (1) his knowledge of what went on regarding the Moccasin Bend project came mostly from reading the testimony of others rather than from specific recollection, (2) when he (Murphy) used the word "arrangement" in earlier proceedings

he was groping for words, and (3) he believed upon reflection that his earlier testimony concerning a conversation in Hawaii was inaccurate in that Murphy and Trepte did not discuss Moccasin Bend.

In support of its motion for summary judgment, the government presented proof that Fischbach inflated its bid from a pre-conspiracy figure of $5,841,684 by $1,368,-316 to arrive at a figure of (as adjusted by Blount for comparison sake) $7,160,000. Commonwealth's winning bid (as adjusted) was $6,879,000 and was inflated $551,780 by the conspiracy. According to the government's proof, the conspiracy inflated the cost a total of $1,037,316. The injury alleged by the government represents seventy-five percent of the latter figure, or $777,987 [1].

Although the government's complaint was grounded in the common law theory of unjust enrichment in addition to violations of the False Claims Act, the government's summary judgment motion and the district court's judgment were based solely on violations of the False Claims Act, 31 U.S.C.A. § 3729(a)(1) and (a)(3). As amended in 1986, those sections provide recovery to the government for submission of false claims and conspiracies to submit false claims as follows:

> Any person who—
>
> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval; [or]
>
> . . . .
>
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
>
> . . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the

Government sustains because of the act of that person....

31 U.S.C.A. § 3729(a) (Supp.1990).

Prior to the 1986 amendments, the statute allowed only double, rather than treble damages and a civil forfeiture of only $2,000. The 1986 amendment also defined "knowingly" for purposes of the statute to include "deliberate ignorance of the truth." 31 U.S.C.A. § 3729(b) (Supp.1990). Prior to the 1986 amendment, this circuit required a showing "actual knowledge" of the falsity of the claim by clear, unequivocal evidence. *United States v. Ekelman & Assoc.*, 532 F.2d 545, 548 (6th Cir.1976). The district court determined that the 1986 amendments were to be applied retroactively to the acts committed between 1980 and 1985 since it would not work a manifest injustice in this particular case.

The district court was persuaded that the criminal conviction established a conspiracy to submit false claims. As to defendant Murphy, the district court viewed the dispositive questions as "whether Murphy himself knowingly caused the false or fraudulent claims to be presented and whether Murphy conspired to defraud the United States by having the false and fraudulent claims presented." To Murphy's arguments that the evidence showed, at most, conscious avoidance of the conspiracy rather than participation in the conspiracy, *see United States v. Ciambrone*, 787 F.2d 799, 810 (2d Cir.), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986), the district court responded that the evidence showed that Murphy merely avoided consciously knowing the details of the conspiracy rather than avoiding participation in the conspiracy.

The district court awarded actual damages of treble the difference in the final adjusted bid Fischbach would presumably have submitted absent the conspiracy and Commonwealth's winning final adjusted bid. The district court also awarded a $10,-000 forfeiture for each of the thirty-nine claims submitted by Commonwealth under

---

**1.** The federal government reimbursed the City of Chattanooga for seventy-five percent of the cost of the project.

the false claims provision of the statute and one $10,000 forfeiture for the underlying conspiracy. Because of the defendants' prior involvement in bid rigging, the district court imposed the maximum forfeiture for each fraudulent claim.

The principal issues argued by Murphy are that the district court improperly applied the 1986 amendments to the False Claims Act retroactively and that there were genuine issues of material fact regarding Murphy's knowledge of and his participation in the conspiracy.

## II.

### A.

■ A district court's grant of summary judgment is reviewed de novo. *McKee v. Cutter Laboratories, Inc.*, 866 F.2d 219, 220 (6th Cir.1989). In our review, this court must view all facts and the inferences drawn therefrom in the light most favorable to the nonmoving party. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). Summary judgment is appropriate only where the "moving party has [carried] the burden of showing conclusively that no genuine issue of material fact exists." *Id.*; *see* Fed.R.Civ.P. 56(c).

■ Not every factual dispute, however, will preclude summary judgment. Any fact in dispute must be material in that it could potentially affect the outcome. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The dispute must be genuine in that the evidence allows resolution in favor of the nonmoving party. *Id.* Thus, "summary judgment will not lie ... if the evidence is such that a reasonable jury could return a verdict for the nomoving party." *Id.*

### B.

■ Since the 1986 amendments provided a definition of "knowingly" to include

conduct which the Sixth Circuit would not previously have viewed as criminal, *see United States v. Ekelman & Assoc.*, 532 F.2d 545, 548 (6th Cir.1976), and imposed greater liability, Murphy argues that the amendments should not have been applied retroactively. In deciding that the 1986 amendments should be applied retroactively, the district court relied upon *United States v. Hill*, 676 F.Supp. 1158 (N.D. Fla. 1987). *See also United States v. Oakwood Downriver Med. Center*, 687 F.Supp. 302, 308 (E.D.Mich.1988); *Gravitt v. General Elec. Co.*, 680 F.Supp. 1162, 1163 (S.D. Ohio) (following *Hill*), *appeal dismissed*, 848 F.2d 190 (6th Cir.), *cert. denied*, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988). The court in *Hill* relied upon *Bradley v. School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), for the "principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in a manifest injustice or there is statutory direction or legislative history to the contrary." *Hill*, 676 F.Supp. at 1166. The *Hill* court found no statutory direction or legislative history against retroactive application and no manifest injustice. *Id.* at 1166–68.

The problem with *Hill*, as counsel for Murphy pointed out at oral argument,[2] is that the broad rule stated in *Bradley* is in "apparent tension" with the Supreme Court's "recent reaffirmation [in *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 207, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988)] of the generally accepted axiom that '[r]etroactivity is not favored in the law.... [C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.'" *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990) (quoting *Bowen*, 488 U.S. at 207, 109 S.Ct. at 471). Because *Kaiser* was

---

2. Murphy's counsel admitted at oral argument that prior to his discovery of *Kaiser, infra*, he had thought *Bradley* to be the controlling case and pursued only the manifest injustice argument under *Bradley*. However, Murphy's co-defendant Fischbach vigorously contested, at all stages of this litigation, the application of *Bradley*, and the government conceded at oral argument that Murphy was entitled to rely on the foundation laid by Fischbach given the circumstances of Fischbach's last-minute dismissal of its appeal.

easily resolved on the basis of clear legislative intent, the Court left unresolved the tension between *Bowen* and *Bradley*. In this case, just as there is no clear language or legislative history forbidding retroactive application, there is no clear language or legislative history requiring it. *See Kelsoe v. Federal Crop Ins. Corp.*, 724 F.Supp. 448, 450 (E.D.Tex.1988); *United States ex rel. Boisvert v. FMC Corp.*, No. 86–20613 (N.D. Cal. Sept. 8, 1987) (unpublished order); *United States ex rel. McCoy v. California Med. Review, Inc.*, 723 F.Supp. 1363, 1367–68 (N.D.Cal.1989); *Oakwood Downriver*, 687 F.Supp. at 307; *Hill*, 676 F.Supp. at 1166–68. *But see United States v. Bekhrad*, 672 F.Supp. 1529, 1530 (S.D. Iowa 1987) (finding suggestion of prospective intent in a letter from budget office to judiciary committee). Thus, we must choose between the broad statement of the law in *Bradley* and the recent reaffirmation in *Bowen* of the general rule against retroactive application. We bear in mind that *Bradley* has frequently been cited as controlling authority in this circuit. *E.g., Harper–Grace Hosps. v. Schweiker*, 691 F.2d 808, 811 (6th Cir.1982); *Bush v. State Indus.*, 599 F.2d 780, 786 (6th Cir.1979).

Even before *Bowen*, the Supreme Court declined to follow *Bradley* in *Bennett v. New Jersey*, 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985). In *Bennett*, the question was whether amendments to Title I should be applied retroactively to validate the use of funds in a way which would not have been legal before the amendments. The *Bennett* court distinguished *Bradley* on the ground that "the Government's right to recover any misused funds preceded the 1978 Amendments" and placed the case within the rule that a court should not "apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional." 470 U.S. at 639, 105 S.Ct. at 1560. *Bennett* found the latter principle consistent "with another venerable rule of statutory interpretation, *i.e.*, that statutes affecting substantive rights and liabilities are presumed to have only prospective effect." *Id.* (citations omitted).

We followed *Bennett* rather than *Bradley* in *Boddie v. American Broadcasting Companies*, 881 F.2d 267 (6th Cir.1989), *cert. denied*, ― U.S. ―, 110 S.Ct. 737, 107 L.Ed.2d 755 (1990), to reject the argument that *Bradley* "established a 'strong presumption' in favor of retroactive application." *Id.* at 269. We stated:

> More recent decisions, however, make clear that *Bradley* represents a relatively narrow exception to the general "principle that statutes operate only prospectively," a notion "familiar to every law student." These post-*Bradley* cases have reaffirmed the "venerable rule ... that statutes affecting substantive rights and liabilities are presumed to have only prospective effect."

*Id.* at 270. Although some circuits have concluded that *Bradley* and *Bowen* are in irreconcilable conflict and have chosen to follow *Bowen*, (*DeVargas v. Mason & Hanger–Silas Mason Co.*, 911 F.2d 1377, 1390 (10th Cir.1990), *cert. denied*, ― U.S. ―, 111 S.Ct. 799,112 L.Ed.2d 860 (1991); *Sargisson v. United States*, 913 F.2d 918, 922–23 (Fed.Cir.1990)) the Eleventh Circuit has stopped short of rejecting *Bradley* outright by refusing retroactive application of a statute which would interfere with antecedent rights. *Wright v. Director, FEMA*, 913 F.2d 1566, 1573 (11th Cir.1990). Thus, at least to some extent, *Wright* is consistent with and supports *Boddie*. *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1505 (6th Cir.1989), *cert. denied*, ― U.S. ―, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990), and *Ratliff v. Wellington Exempted Village Schools Board of Education*, 820 F.2d 792, 797 (6th Cir.1987), cited by the government, are not to the contrary. In *Meyer* the appellant conceded the applicability of *Bradley*, and *Ratliff* involved a change in decisional rather than statutory law.

The government contends that the amendments at issue in this case are merely remedial and do not affect substantive rights and liabilities. There is considerable support in the lower courts for this proposition. *See, e.g., Oakwood Downriver*, 687 F.Supp. at 306 (definition of "knowing"

was procedural, intended to address conflicting decisional law between circuits); *Hill*, 676 F.Supp. at 1169 (no matured right to a particular standard of liability). *But see, United States ex rel. Boisvert v. FMC Corp.*, No. 86–20613 (N.D.Cal. Sept. 8, 1987) (unpublished order) (amendments may not be applied retroactively to cut off an existing defense); *Hyatt v. Northrup Corp.*, No. 86–6437–KN, 1988 WL 156739 (C.D.Cal. March 31, 1988) (unpublished order) (following *Boisvert*); *United States v. Bekhrad*, 672 F.Supp. 1529, 1530 (S.D.Iowa 1987) (recognizing that amendments are remedial but refusing to apply retroactively because the increased penalties create new liability); *United States v. Green Const. Co.*, No. A86–263 (D.Ak. Nov. 12, 1987) (unpublished order) (applying Bradley but finding manifest injustice because "Congress ... changed the rules of the game four years after the game ended").

However, *Boddie* and the recent Supreme Court cases convince us not only that *Bradley* is to be read narrowly, but also that the phrase "substantive rights and liabilities" is to be construed broadly in this context. In *Boddie*, at the time of the acts underlying the action, the statute at issue provided liability where a communication was "intercepted for the purpose of committing any criminal or tortious act ... or for the purpose of committing any other injurious act." 881 F.2d at 268 (quoting 18 U.S.C. § 2511(2)(d)). Before the case was decided by the district court, Congress deleted the "injurious" purpose language. We held:

> The 1986 amendment to section 2511(2) clearly affected "substantive rights and liabilities." Prior to the amendment, the plaintiff ... could recover by proving that the defendant acted with either a tortious or criminal purpose, or an injurious purpose; the amendment limited recovery to cases where the plaintiff can prove the former. Since it altered substantive rights and liabilities, the amendment is presumed to apply only prospectively.

*Id.* at 270.

In this circuit Murphy could only have been held liable prior to the amendments

upon a clear showing of actual knowledge of the falsity of the claims that were submitted. *Ekelman*, 532 F.2d at 548. After the amendment, he could be liable if he had constructive knowledge of the falsity, *viz.*, "deliberate ignorance of the truth." Thus, by analogy to *Boddie*, the amendments affected substantive rights and liabilities, at least in this circuit. *See also Kaiser*, 110 S.Ct. at 1578 (fixed expectation that prejudgment interest would be determined as of date of judgment); *Winfree v. Northern Pac. Ry. Co.*, 227 U.S. 296, 302, 33 S.Ct. 273, 274, 57 L.Ed. 518 (1913) (refusing to apply retroactively in a civil case a statute which "takes away material defenses"); *Griffon v. United States Dept. of Health and Human Servs.*, 802 F.2d 146, 151 (5th Cir.1986) (refusing retroactive applications of civil penalties provision which "enlarged the scope of substantive liability [by] allowing prosecutions of those who 'had reason to know'"); *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 109, 522 N.E.2d 489, 498 (1988) (statutory change in common law definition of intentional tort was substantive change not to be applied retroactively).

Moreover, the amendments in this case were applied to increase the liability of an individual by more than $1,000,000. Thus, the amendments were used to "create a new liability in connection with a past transaction." *Bekhrad*, 672 F.Supp. at 1530. Accordingly, we hold that it was error for the district court to apply the amendments retroactively.

## C.

 Even if the amendments applied retroactively, which they do not, and even if it were conclusively established that Murphy had the requisite constructive knowledge, which we need not decide, we are convinced that the government would not have been entitled to summary judgment. Constructive knowledge that something illegal may have been in the offing is not enough to prove the government's case. The constructive knowledge amendment to the False Claims Act applies only to the

information submitted. *See* 31 U.S.C.A. § 3729(b) (Supp.1990). It does not eliminate the need under subsection (a)(1) for some action by the defendant whereby the claim is presented or caused to be presented. *Cf. United States v. Bornstein*, 423 U.S. 303, 313, 96 S.Ct. 523, 530, 46 L.Ed.2d 514 (1976)) (under (a)(1) court must look to "the specific conduct of the person from whom the Government seeks to collect"). Nor does the constructive knowledge amendment to the Act eliminate the need under subsection (a)(3) for proving that a person is a member of the alleged conspiracy. As we read the district court's opinion, the conduct for which Murphy has been held liable is the submission of claims by his alleged co-conspirator Commonwealth Electric. This would be permissible only if Murphy was truly a member of the conspiracy. *See United States v. Cripps*, 460 F.Supp. 969, 975–76 (E.D.Mich.1978) (Kennedy, C.J.).

■ A recent authoritative statement of what is required to prove a civil conspiracy is found in *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir.1985):

A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

The question of whether a person was a participant in a conspiracy is a question of fact. *See United States v. August*, 745 F.2d 400, 405 (6th Cir.1984) (criminal case); *Cf. Ghandi v. Police Dept. of Detroit*, 747 F.2d 338, 345 (6th Cir.1984) (recognizing that cases involving conspiracy allegations are not well suited to summary judgment).

Murphy argued before the district court, as he does here, that his conscious avoidance of knowledge of the conspiracy was inconsistent with participation in the conspiracy. *See Ciambrone*, 787 F.2d at 809–10. After carefully reviewing the record and briefs, and hearing the arguments of counsel, we are of the view that a reasonable trier of fact could conclude that Murphy was not a participant in the conspiracy. We do not doubt that the government's proof allows the inference that Murphy was a member of the conspiracy; however, it does not compel that conclusion. This is especially true given that resolution of this case requires a determination of Murphy's state of mind, *viz.*, whether he shared the conspiratorial objective. *See Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988) (questions of intent are less prone to summary judgment). We emphasize that in reviewing the summary judgment granted by the district court against Murphy, we must view inferences from the proof in the light most favorable to him. However, we are in no wise suggesting or implying what the eventual outcome of this case should be.

■ The government points to inconsistencies in Murphy's testimony and relies on the rules that a litigant cannot create a material issue of fact by affidavit contrary to earlier testimony, *see Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 315 (6th Cir.1989), and that discredited testimony will not normally furnish sufficient evidence to withstand a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986). However, these rules become dispositive only if the government's proof compelled a conclusion that Murphy was a member of the conspiracy. Moreover, while Murphy admitted that his testimony in earlier proceedings was not consistently truthful, the witness who furnishes the bulk of the case against Murphy, *i.e.*, Trepte, has also admitted that his testimony has not been consistently truthful. *See* J.A. 1002–1004.

### III.

For the reasons stated, the judgment of the district court is REVERSED and this

case is REMANDED for further proceedings consistent with this opinion.

ENGEL, Senior Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's conclusion that the 1986 amendments to the False Claims Act, 31 U.S.C. §§ 3729–3733, should not have been applied retroactively in this case. I also agree with the majority's judgment that genuine issues of material fact existed which precluded summary judgment in favor of the government on Count I of the complaint. When we apply the "actual knowledge" standard of *United States v. Ekelman & Assoc.*, 532 F.2d 545, 548 (6th Cir.1976), we cannot say as a matter of law that defendant Murphy knew the details of the bid-rigging scheme which his subordinate Trepte arranged.

However, I believe on the second count of the government's claim against defendant Murphy—the conspiracy count—the government was entitled to summary judgment, and I dissent from the majority's conclusion that genuine factual issues remain concerning this question. I believe the district court properly concluded that Murphy did participate in a conspiracy to rig the bids on the Moccasin Bend project. Murphy's attempts to bury his head in the sand during the bid-rigging process, and his presentation of self-serving affidavits which conflict with the testimony of other participants in the conspiracy, are insufficient in my mind to create genuine issues of material fact on Count II of the government's claim against him, and I would affirm the granting of summary judgment on the conspiracy count.

Though all inferences must be drawn in favor of the nonmoving party when a court considers a motion for summary judgment, *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986), "[t]he nonmoving party is not entitled to a trial merely on the basis of allegations; significant probative evidence must be presented to support the [nonmovant's position]." *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986). Mere "metaphysical doubt as to the material facts" is insufficient to create a genuine issue of fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

While I agree with the majority that we must be hesitant to grant summary judgment against a party when his state of mind or intent is at issue, discredited or incredible testimony is insufficient to create a genuine issue of material fact regarding intent or state of mind. *Bose Corp. v. Consumers Union*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984). The district court below found that Murphy's statements were inconsistent, implausible and sometimes perjurious. A reasonable jury could only conclude that he was a participant in a conspiracy to rig the bids on the Moccasin Bend project.

Fischbach & Moore, Inc., Murphy's employer, has already been convicted in federal court of entering into a conspiracy to rig bids with its competitor on the Moccasin Bend project. According to Bernard Trepte, a Fischbach district manager and subordinate of Murphy, Murphy authorized the bid rigging which admittedly took place. Though Murphy sent Trepte to handle the details, Murphy was clearly aware of the plan to artificially inflate the cost of the project at the bidding stage. He first testified that he had "vague recollections that Trepte told [him] at the [National Electrical Contractors' Association] convention in Honolulu, Hawaii in June 1980 that he [Trepte] had reached 'an accommodation'" with the competing electrical contractor on the Moccasin Bend project. Before the meeting at which the bids were inflated, Murphy called Phillip Mahoney, his counterpart at the competing company. Murphy testified that Mahoney suggested the supervisors "stay out of it", and that their respective subordinates, Trepte and William Kale, "handle any arrangement" on the bids. When asked to explain what kind of "arrangement" he understood that to mean, Murphy explained that since there were only two or three competitors for the job, Trepte had a good chance to rig the bid. Murphy admits that he told Trepte, "whatever you are going to do up there [in Chattanooga], you are doing it on your own, I'm not involved in it."

Murphy's defense is that he had no knowledge prior to the submission of the bids that an illegal arrangement had been reached. Yet Count II is a conspiracy count, and as long as Murphy agreed with Trepte's plan to rig the bid at his meeting with Kale, Murphy is liable even under the pre–1986 version of the False Claims Act applicable to this case. He need not have known every detail of the arrangement, nor participated in the actual meeting to be liable as a conspirator.

Although the essence of conspiracy is agreement, an express agreement is not necessary to prove a civil conspiracy. *Hobson v. Wilson*, 737 F.2d 1, 51 (D.C.Cir. 1984); *Lenard v. Argento*, 699 F.2d 874, 882 (7th Cir.1983). Tacit understanding, created and executed over time, is enough to constitute an agreement even absent personal communication. *Direct Sales Co. v. United States*, 319 U.S. 703, 714, 63 S.Ct. 1265, 1271, 87 L.Ed. 1674 (1943). Once the existence of a conspiracy has been established, slight evidence is needed to connect a particular participant to the conspiracy. *United States v. Braasch*, 505 F.2d 139, 148 (7th Cir.1974). Each conspirator is liable for the overt acts committed by any member of the conspiracy, even if the defendant did not personally commit the acts. *Poliafico v. United States*, 237 F.2d 97, 104 (6th Cir.1956). As the majority's opinion indicates, "[e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved". *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir.1985).

I find no genuine issues of material fact remaining on the question of the conspiracy's existence or Murphy's actual knowledge of its existence and agreement with its participants. That he tried to insulate himself from liability by delegating responsibility to his subordinate does not make him any less culpable. He told Trepte that he (Murphy) would "help with Commonwealth" (the competitor) if Trepte had any problems with the bid. After this conversation, Trepte went to Chattanooga and rigged the bids on the project, later informing Murphy that "an accommodation" had been reached on the bid. Certainly there was an agreement to commit an unlawful act, Murphy shared in that conspiratorial objective, and other members of the conspiracy committed overt acts in furtherance of the agreement. *See Hooks*, 771 F.2d at 944. These facts are sufficient to find Murphy liable on the conspiracy count as a matter of law.

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (footnote omitted). Murphy's current inability to recall the substance of conversations with Trepte and Mahoney fails to convince me that he was not part of the conspiracy which Trepte and Kale described in earlier legal proceedings. I join in Parts I and II–A and B of the majority's opinion, but dissent from Part II–C. Murphy clearly conspired to rig the bids on the Moccasin Bend project, and I would affirm the district court's granting of summary judgment against him on the conspiracy count.