**Jerry J. WRIGHT, Plaintiff–Appellee,**

v.

**DIRECTOR, FEDERAL EMERGENCY MANAGEMENT AGENCY, Defendant–Appellant.**

No. 89–4033.

United States Court of Appeals, Eleventh Circuit.

Oct. 11, 1990.

Samuel A. Alter, Jr., Asst. U.S. Atty., Lyndia P. Barrett, Pensacola, Fla., Ellen M. Neubauer, Federal Emergency Management Agency, Lori M. Beranek, Michael J. Singer, Dept. of Justice, Civ. Div., Appellate Staff, Washington, D.C., for defendant-appellant.

George H. Gwynn, T. Whitney Strickland, Jr., Owen, Gwynn & Lewis, Tallahassee, Fla., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, FAY Circuit Judge, and HOFFMAN *, Senior District Judge.

FAY, Circuit Judge:

Defendant–Appellant, the Director of the Federal Emergency Management Agency ("FEMA"), seeks reversal of a district court order granting summary judgment for plaintiff-appellee, whose home had been covered by a flood insurance policy issued under the National Flood Insurance Program. The district court held that a regulation promulgated by FEMA effective October 1, 1988, which eliminated an exclusion for ground level structures and contents of certain elevated buildings, applied retroactively to plaintiff's flood losses in August and September of 1985. Because we think that the district court erred in giving the 1988 regulation retroactive effect to cover flood losses that occurred more than two years prior to the effective date of the new regulation, we VACATE

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

the district court's order and REMAND for judgment in favor of FEMA.

## BACKGROUND

In 1968, pursuant to the National Flood Insurance Act ("the Act"), Congress authorized the National Flood Insurance Program ("the Program"), a federally subsidized effort to make flood insurance affordable on a nationwide basis to those in need of such protection. 42 U.S.C. § 4001(d)(1) (1988). FEMA administers the Program.[1] Consequently, the Act authorizes the Director of FEMA to "provide by regulation for general terms and conditions of insurability" for eligible properties, after consulting with an advisory committee, as well as representatives of a pool of private insurers and state insurance authorities. 42 U.S.C. § 4013(a). The terms and conditions of policies issued under the Program are stated in the standard policy issued to each insured, and also appear in the Code of Federal Regulations as administrative regulations, subject to procedural requirements such as notice and comment.[2]

This case arose from the partial denial of two claims submitted by plaintiff-appellee Wright under standard policies issued by FEMA pursuant to the Program. Wright, the owner of residential property in West Indian Pass, Florida, suffered flood dam-

age to the property on two separate occasions: during Hurricane Alena on August 31, 1985, and again during Hurricane Kate on November 21, 1985. At both times, a Standard Flood Insurance Policy[3] ("SFIP") issued by FEMA was in full force and effect.[4] Wright submitted claims for his losses to FEMA.

In each instance, FEMA paid a portion of Wright's claim, but denied coverage for damage to structural components and personal property within the lowest level of plaintiff's structure. This was because Article V(F) of the SFIP excluded coverage for damage to enclosures and contents of floors lower than the lowest elevated floor in an "elevated building." 44 C.F.R. Pt. 61 App. A(1), Art. V(F) (1985). FEMA denied full coverage to Wright's residence because it determined the dwelling to be an "elevated building" within the meaning of the policy. Wright then filed an action in the district court challenging FEMA's denial of coverage. The parties filed cross-motions for summary judgment on the issue of whether Wright's residence was an "elevated building."

On January 11, 1989, the district court found that Wright's dwelling was in fact an "elevated building," a conclusion which would have placed Wright's damages within the ambit of the policy exclusion, and

---

1. In the Act, Congress established two methods of providing for low-cost flood insurance in high-risk areas. Under Part A of Subchapter II of the Act, 42 U.S.C. §§ 4051–4056, the Secretary of Housing and Urban Development ("HUD") encouraged and enlisted insurance companies to join in a pool to provide flood insurance coverage. If, however, the Secretary determined that private insurance companies alone could not carry out the provisions of the program, the Secretary could, pursuant to Part B of Subchapter II, 42 U.S.C. §§ 4071–4072, operate the program using insurance companies, brokers, and agents as "fiscal agents of the United States." 42 U.S.C. § 4071(a)(1). From 1968–1977, the Flood Insurance Program operated primarily as explained in Part A, through an insurance association composed of volunteer insurance organizations. In 1978, however, the Secretary of HUD assumed responsibility under Part B of the program, and became the insurer for all outstanding flood insurance policies. On April 1, 1979, Executive Order 12127, 44 Fed. Reg. 19,367 (1979), transferred operation of the Flood Insurance Program to FEMA.

2. *See* 44 C.F.R. Part 61 App. A(1) (1985); 44 C.F.R. § 61.4(a)(2) (1985). The standard policies are published as part of the regulations at 44 C.F.R. Pt. 61 App. A(1). By its terms, however, each standard policy is "the entire written contract" between FEMA and the insured. 44 C.F.R. Pt. 61 App. A(1), Art. II (definition of "policy").

   Each standard policy has a limited term and must be renewed prior to expiration if the insured wants uninterrupted, continuous coverage through the Flood Insurance Program. The October 1, 1985 version of the standard policy contains the terms under which Wright's claims were brought.

3. SFIP Number FL–2–00095–8266–5. *See* 44 C.F.R. Pt. 61 App. A(1) (1985).

4. FEMA issued the policy to Wright effective September 25, 1984, for a period of one year. The policy was renewed effective September 25, 1985, for another one-year period.

consequently justified FEMA's denial of coverage. The district court, however, stayed its decision, and asked the parties to submit briefs concerning the applicability of an October 1, 1988 amendment to the SFIP ("October Amendment"). *See* 53 Fed.Reg. 27,989 (July 26, 1988). If retroactively applicable, the narrower, amended exclusion clause would no longer encompass Wright's residence, and he would be able to recover from FEMA.[5]

Upon re-briefing, the district court granted summary judgment in favor of Wright. Applying *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), the court stated that it must apply the law in effect at the time it rendered its decision. It therefore found that the October Amendment to Article V(F) of the SFIP applied retroac-

tively to the policies under which Wright sustained losses.[6] The court held that the "exclusion of Article V(F) as found in the Code of Federal Regulations prior to October 1, 1988, does not apply, and the amended Article V(F) which would allow coverage for pre-FIRM buildings does apply." FEMA appeals this retroactive application of the 1988 regulation.

## DISCUSSION

Preliminarily, we note that the Eighth Circuit has very recently visited the identical question raised in this case, holding that "the October 1, 1988, amendment of the elevated structure exclusion does not have retrospective effect." *Criger v. Becton,* 902 F.2d 1348, 1355 (8th Cir.1990). For the reasons set forth below, we are in accord with the Eighth Circuit's position.[7]

---

5. The regulation amended Article V(F) to provide an exclusion for "[e]nclosures, contents, machinery, building components, equipment and fixtures located at an elevation lower than the lowest elevated floor of an elevated *Post–FIRM* building." 44 C.F.R. Pt. 61 App. A(1), Art. V(F) (1989) (emphasis supplied). A "Post–FIRM" building is defined in the amendment as a "building for which the start of construction or substantial improvement occurred after December 31, 1974, or on or after the effective date of the initial Flood Insurance Rate Map (FIRM) for the community in which the building is located, whichever is later." *Id.* at App. A(1), Art. II (def. of "Post–FIRM building"). The flood plain management regulations in the county where Wright's residence is located were enacted on June 24, 1983, which made residents eligible for the Program. Wright constructed his dwelling in 1982, rendering it a Pre–FIRM dwelling. Therefore, as the district court observed, the amended exclusion clause, if applicable, does not apply to Wright's residence.

6. In deciding to apply *Bradley,* the court reasoned as follows:
> If the insurance policy between the parties was an insurance agreement negotiated through the typical bargaining process, I would be inclined to agree with the defendant that the new regulation should not apply to a contract which terminated prior to the date of the amendment. However, policies issued under the National Flood Insurance Program are not typical contracts.
> The insured applies for coverage through an agent which is merely a conduit for the federal government for issuing the policy. The policy declarations specify the amount of coverage and the period for which a premium is paid. The terms of the coverage are specified in the

Code of Federal Regulations. There is no bargaining or 'contracting' in the traditional sense. Neither the insured nor the agent can negotiate the terms of the policy; the insured must accept the operative terms provided in the regulations or seek flood insurance elsewhere (which is nearly nonexistent for property in flood-prone areas).
> Under these circumstances, I cannot find that the regulations are incorporated into an agreement which is purely a term 'contract' between the parties for one year at a time. A closer analogy is that the policy signifies that the insured has been accepted into a program for public benefits provided by the federal government to a certain class of individuals. Benefits afforded to the insured under the National Flood Insurance Program are governed by regulation, as are most such public benefit programs. Thus, I must find that the substantive agreement between the parties is governed by 'regulation' rather than by a 'contract.' Therefore, the law concerning the retroactive application of a regulation should control.

7. In our case, the district court relied heavily on the district court's rationale and holding in *Criger,* which had been the only court to examine previously the effect of the October 1, 1988 amendment of the elevated structure exclusion on earlier policies issued by the Program. *See Criger v. Becton,* 702 F.Supp. 761 (E.D.Mo.1988). As in our case, the *Criger* district court held that the new FEMA regulation applied retroactively, permitting the plaintiff to recover for flood damage to his property that occurred in October, 1986. And as in our case today, the district court's ruling was overturned on appeal. *Criger,* 902 F.2d 1348 (8th Cir.1990).

We begin by taking issue with the district court's conceptualization of the insurance policies issued by the National Flood Insurance Program. FEMA argued that the October Amendment should not apply retroactively because it was not adopted during the existence of the insurance policies at issue in this case. The district court viewed this argument as raising "the question of whether the agreement between the parties should be treated strictly as a contract or as a legal relationship controlled by the regulatory process." Indeed, the district court itself suggested that if the policies were viewed as insurance agreements "negotiated through the typical bargaining process, I would be inclined to agree with [FEMA] that the new regulation should not apply to a contract which terminated prior to the date of the amendment." The court felt, however, that because of various aspects of federal involvement with the Program, the policies issued by FEMA were better analogized to "public benefits provided by the federal government to a certain class of individuals."

▮ We feel that the district court's view of the policies involved here as "public benefits" is simply incorrect. It is certainly true that the Program is a hybrid creature of federal government and private insurance company cooperation. *See* 42 U.S.C. § 4001(d)(1). But characterizing the Program in terms of "government benefits" ignores its essential framework and design; it is a program devised to provide individual *insurance contracts* to purchasers. Thus, the mere fact that the Program is federally subsidized "does not compel the conclusion that the premiums insureds pay are not expected to defray the cost of covering the risk." *Criger*, 902 F.2d at 1351. The Program authorizes estimation of premium rates according to standard insurance risk and actuarial studies, 42 U.S.C. § 4014 (1988), and "it is clear that Congress did not intend to abrogate standard insurance law principles which affect such estimates and risks." *Drewett v. Aetna Casualty & Sur. Co.*, 539 F.2d 496, 498 (5th Cir.1976); *accord Atlas Pallet, Inc. v. Gallagher*, 725 F.2d 131, 135 (1st Cir.1984). Although the Program "offers subsidized flood insurance, it is designed to operate much like any private insurance company." *Drewett*, 539 F.2d at 498.[8]

▮ Furthermore, it is well settled that an insurance policy is a contract. *See e.g., Clyce v. St. Paul Fire & Marine Ins. Co.*, 850 F.2d 1398, 1401 (11th Cir.1987). FEMA's administration of the insurance program does nothing to alter the status of the policies as insurance contracts.[9] As

---

8. This point is evidenced by FEMA's declared intent to increase the premium rate for elevated, enclosed Pre–FIRM buildings in an effort to cover at least a portion of the additional cost of the expanded coverage under the October Amendment:

    Since Pre–Firm buildings with enclosures would no longer be subject to the limitation coverage under the SFIP, FEMA intends to increase the premium rates for such buildings as part of future premium rate changes after this rule becomes final. Thus, the existing premium rate differential between the rates for Pre–FIRM elevated buildings without enclosures and the higher rates for Pre–FIRM elevated buildings with enclosures would be increased.

    53 Fed.Reg. 10,548 (1988) (proposed April 1, 1988). As the Eighth Circuit has observed, "[w]ith a private insurer, one generally pays higher premiums to get increased coverage. We do not accept the proposition that, merely because [the Program] is federally assisted, it is divorced from the actuarial principles that govern the actions of private insurers." *Criger*, 902 F.2d at 1352.

9. Indeed, in *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), the Supreme Court rejected the argument that insurance policies provided through a federal insurance program, developed for reasons of public benefit and not for profit, should not be treated as insurance contracts. In *Lynch*, beneficiaries of renewable term life insurance policies issued pursuant to the War Risk Insurance Act challenged a 1933 statute that repealed all laws providing yearly renewable term insurance. 292 U.S. at 573. The Court recognized that although the federal insurance program at issue was designed to effect a benevolent purpose, its insurance policies were nonetheless "legal obligations of the same dignity as other contracts of the United States and possess the same legal incidents." *Id.* at 576, 54 S.Ct. at 842. The Court found that the government-issued insurance policies, as contracts, created vested rights, *Id.* at 577, 54 S.Ct. at 842, and declared that when "the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Id.* at 579, 54 S.Ct. at 843 (footnote omitted).

contracts, the standard policies issued under the Program are governed by federal law, *see West v. Harris*, 573 F.2d 873, 880–81 (5th Cir.1978), *cert. denied*, 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 635 (1979), applying "standard insurance law principles." *Id.* at 481; *Drewett*, 539 F.2d at 498.

In construing the policies, it "is a basic tenet of insurance law that each time an insurance contract is renewed, a separate and distinct policy comes into existence." *Hercules Bumpers, Inc. v. First State Ins. Co.*, 863 F.2d 839, 842 (11th Cir.1989).[10] In this case, the policies applicable to Wright's losses terminated on September 25, 1985, and September 25, 1986, respectively. These terms, i.e. the policy terms in effect at the time of the flood loss, dictated the contractual conditions of plaintiff's relationship with the government. The terms provided that the ground level contents of elevated buildings such as Wright's residence were explicitly excluded from coverage, and we see no contractual grounds for incorporating into the terms a change in regulations that took effect two years after Wright's applicable policies had expired.

Moreover, we see no reason to alter this conclusion by treating the standard policies issued through the Program differently from other insurance contracts, simply because their terms are set forth in the form of administrative regulations. As the Eighth Circuit recently pointed out with regard to the elevated structure exclusion:

> The regulation at issue is, in effect, a term of an insurance policy. FEMA determines policy terms through ordinary administrative rulemaking simply because the flood insurance program is federally mandated and Congress has vested the agency with responsibility for promulgating policy terms. *See* 42 U.S.C. § 4013(a). The technical rulemaking requirements do not alter the nature of the regulation: it is, in fact, a term of an insurance policy.

*Criger*, 902 F.2d at 1354. Contrary to the district court's analysis, there is no inherent dichotomy between "contract" and "regulation" in examining the substantive terms of an agreement between parties to an insurance contract issued through the Program. Rather, the terms of the policy are communicated by the government through a designated administrative mechanism, which a potential insured is then free to accept or reject in choosing whether she wants the coverage offered.

▆ In any case, evaluating the effect of the October Amendment from a purely administrative perspective yields the same result—we perceive no grounds for retrospective application. Congress appointed the Director of FEMA to "provide by regulation for general terms and conditions of insurability which shall be applicable to properties eligible for flood insurance coverage." 42 U.S.C. § 4013(a). FEMA insists that it did not intend for the October Amendment to apply retroactively, and its interpretation of its own regulation is entitled to great deference by a reviewing court. As the Supreme Court recently declared in a similar case involving agency construction of its own regulation:

> [W]hen it is the Secretary's [of Health and Human Services] regulation that we are construing, and when there is no claim in this Court that the regulation violates any constitutional or statutory mandate, we are properly hesitant to substitute an alternative reading for the Secretary's unless that alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.

*Gardebring v. Jenkins*, 485 U.S. 415, 430, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988); *Criger*, 902 F.2d at 1351; *see Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (great deference accorded agency's interpretation of its own regulation); *Lollar v. Alabama By-Products Corp.*, 893 F.2d 1258, 1262 (11th Cir. 1990) (observing that it is "well established

---

10. Apparently acknowledging this principle, the standard policy issued to Wright defined the term "policy" to include "any renewal certifi- cates indicating that coverage has been instituted for a new policy and policy term." 44 C.F.R. Pt. 61 App. A(1), Art. II (1985).

that 'courts must defer to an agency's consistent interpretation of its own regulation unless it is "plainly erroneous or inconsistent with the regulation" ' "). Further, the Supreme Court has emphasized recently that regulations ordinarily are not to be given retroactive effect: "[r]etroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) (citations omitted).[11] In this case, the October Amendment says nothing to suggest that it was intended to

have retroactive effect.[12] Indeed, as the Eighth Circuit has noted, virtually all of the evidence of FEMA's intent here supports the agency's interpretation of the regulation as prospective. *Criger*, 902 F.2d at 1351.[13]

The district court justified its conclusion by applying the rule set forth by the Supreme Court in *Bradley v. Richmond School Bd.*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), a case that involved the retroactive application of a statutory provision for attorney fees to a fee request pending when the statute was enacted. The Supreme Court grounded its holding on the principle that a court must apply the

**11.** For the same reason, the statutory grant of legislative rulemaking authority to an agency does not, as a general matter, encompass the power to promulgate retroactive rules unless expressly authorized by Congress. *Id.*

**12.** Appellee argues that the standard "liberalization clause" written into the SFIP was "clearly" intended to have retroactive effect, and should reach back to allow a change made in a 1988 insurance policy to cover losses occurring prior to its term, i.e. Wright's 1985 flood losses. We disagree. The clause reads:

*While this policy is in force*, should we have adopted any forms, endorsements, rules or regulations by which this policy could be broadened or extended for your benefit by endorsement or substitution of policy form, then, such matters shall be considered to be incorporated *in this policy* without additional premium charge and shall inure to your benefit as though such endorsement of [sic] substitution of policy form had been made.

44 C.F.R. Pt. 61 App. A(1), Art. IX (1985) (emphasis supplied). We think that it is clear from the above language that the clause is simply a policy mechanism designed to give the insured the immediate benefit of favorable changes to the SFIP *during the policy term of an existing policy* as those changes occur, despite the fact that the insured's policy has not yet been renewed. For example, under the liberalization clause in a policy whose term extends from November 1, 1985, to November 1, 1986, a change in the policy occurring on July 1, 1986 would have no effect on losses that transpired prior to July 1, 1986, but would have immediate effect on losses that occurred after July 1, 1986. There is nothing in the above language to indicate expressly that a policy change would apply retroactively to losses that occurred before the amendment became effective (which would justify shifting the normal presumption of prospective application). And, in any event, the 1984 and 1985 insurance policies "in force" that covered Wright's losses expired in 1985 and 1986,

respectively. Even if a liberalization clause could be construed retroactively, it plainly would be limited by the policy term, as the highlighted language above suggests; in other words, a 1988 liberalization clause could not extend back to modify the terms of policies long since expired. "If each new regulation was potentially effective to amend every SFIP ever written, whether or not the policies had expired, the result would be an administrative nightmare." *Criger*, 902 F.2d at 1354.

**13.** For example, when FEMA promulgated the regulation in the Federal Register on July 26, 1988, it delayed the effective date of the regulation until October 1, a period of more than two months. 53 Fed.Reg. 27, 989 (1988). Under the Administrative Procedure Act (APA), FEMA is ordinarily obligated to publish a final regulation only thirty days in advance of the effective date, *see* 5 U.S.C. § 553(d) (1988), and in situations like this one, where a regulation is intended to relieve a restriction on coverage, the agency could have rendered it effective immediately. Postponement of the effective date of a regulation is generally considered to be evidence of prospective application. 2 J. Sutherland, *Statutes and Statutory Construction* § 41.04, at 350 (N. Singer rev. Sands 4th ed. 1986); *see, e.g., Yakima Valley Cablevision, Inc. v. F.C.C.*, 794 F.2d 737, 747 (D.C.Cir.1986) (prospective effective date for Cable Act provisions taken as evidence that retroactive application not even "remotely implied").

In addition, as noted earlier, FEMA has declared an intent to increase the premium rate for elevated, enclosed pre-FIRM buildings to cover some of its costs for expanded coverage. *See supra* note 8. We agree that "FEMA's plan to charge higher premiums for the broader coverage afforded by the 1988 amendment is plainly inconsistent with an intent to allow recovery for a loss that occurred nearly two years before the 1988 amendment became effective." *Criger*, 902 F.2d at 1352.

law in effect at the time it renders its decision, absent manifest injustice or statutory direction or legislative history to the contrary, *Id.* at 711, 94 S.Ct. at 2016, and noted that this principle applies equally to regulatory amendments made by administrative agencies. *Id.* at 715, 94 S.Ct. at 2018 (quoting *Thorpe v. Housing Auth.,* 393 U.S. 268, 282, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969)).

As the district court suggested, the principle affirmed in *Bradley* has generated some confusion in the federal courts, since it appears to conflict with the aforementioned long-standing rule of statutory construction, restated in *Bowen,* that favors the prospective application of statutes and regulations.[14] *See e.g., Criger,* 902 F.2d at 1353–54; *Iowa Power & Light Co. v. Burlington Northern, Inc.,* 647 F.2d 796, 805 (8th Cir.1981); *Hill v. United States,* 571 F.2d 1098, 1102 (9th Cir.1978). In this case, however, we find no conflict behind *Bradley* and our ruling because of the nature of the issue presented. Simply stated, we would reach an identical result under the *Bowen* concept of presumed prospective regulation, as well as the "manifest injustice" exception to the *Bradley* rule applying new law to pending cases, mentioned below. *See Iowa Power & Light,* 647 F.2d at 805 n. 13.[15]

■ The *Bradley* approach potentially represented a "dramatic shift" in the law of retroactivity, essentially creating a presumption of *retroactive* application of a new law by requiring a court to apply the law in effect at the time its decision is rendered. *See Sikora v. American Can Co.,* 622 F.2d 1116, 1128 (3d Cir.1980) (Adams, J., dissenting). Yet, *Bradley* acknowledged exceptions to this rule in situations where retroactive application of a

statutory or regulatory change would create the threat of "manifest injustice." Thus, under *Bradley,* courts are to examine the nature and identity of the parties, the nature of the parties' rights, and the nature of the impact of the change in law upon those rights, in order to determine whether retroactive application will work an injustice in a particular case. *See Bradley,* 416 U.S. at 717, 94 S.Ct. at 2019. Justice O'Connor explained the expressly acknowledged limits to the *Bradley* principle in *Bennett v. New Jersey:*

> 'The Court has refused to apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional.' This limitation comports with another venerable rule of statutory interpretation, *i.e.,* that statutes affecting the substantive rights and liabilities are presumed to have only prospective effect.

*Bennett,* 470 U.S. 632, 639, 105 S.Ct. 1555, 1559–60, 84 L.Ed.2d 572 (1985) (citations omitted). As *Bennett* suggests, where a regulatory change interferes with matured or vested rights, the *Bradley* analysis coincides with the principle of prospective statutory application—a " 'retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be the "unequivocal and inflexible import of the terms, and the manifest intention of the legislature." ' " *Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621–22, 11 L.Ed.2d 576 (1964) (quoting *Union Pac. R. v. Laramie Stock Yards,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913)) (footnote omitted).

In the instant matter, the district court did not find any "manifest injustice," con-

---

**14.** The Supreme Court itself explicitly recognized quite recently the tension between the *Bradley* and *Bowen* lines of cases, although it declined the opportunity to reconcile them. *See Kaiser Aluminum & Chemical Corp. v. Bonjorno,* — U.S. —, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990).

**15.** Like the district court in our case, the *Criger* district court reached its conclusion of retrospective application of the October Amendment by applying *Bradley.* On appeal, the Eighth

Circuit summarily rejected the *Bradley* approach as "inappropriate," and relied solely on precedent articulating the principle that statutes, regulations are not to be given retroactive effect unless evidenced by an express legislative purpose. *See Criger,* 902 F.2d at 1354. We see no need to reject the application of *Bradley* outright, since, as mentioned, *Bradley* analysis here also mandates prospective application of the October Amendment.

cluding that "[FEMA] has no vested interest in [the Program's] funds, so requiring it to pay for the plaintiff's flood damage will not deprive it of a vested right." We disagree.

Wright entered into a *contractual* relationship with FEMA when he signed consecutive insurance policies under the Program. The policies were for fixed terms, and Wright was obligated to pay a yearly premium. Each party was bound to comply with the explicit terms of the policies. Based on the terms of the policy, the federal government established premium rates, estimated the cost of the program, and determined the contours of its liability. It acted, like a private insurance company, according to the terms of the contracts entered into in 1985 and 1986. As in *Bennett*, such a relationship created unconditional and matured rights upon which the parties relied. Retroactive application of the October Amendment would deny both the federal agency[16] and Program participants "fixed, predictable standards for determining if expenditures are proper." *Bennett*, 470 U.S. at 640, 105 S.Ct. at 1560. Further, as in *Bennett*, there are comparable "practical considerations related to the administration of" an insurance program, 470 U.S. at 638, 105 S.Ct. at 1559, which necessitate obligations being generally determined by the policy terms in effect at the time Wright was actively insured under a SFIP.[17]

In sum, on the facts of this case, we agree with the Supreme Court's pronouncement that statutes (and regulations) "are not to be given retroactive effect or construed to change the status of claims fixed in accordance with earlier provisions unless the legislative purpose so to do plainly appears." *United States v. Magnolia Petroleum Co.*, 276 U.S. 160, 162–63, 48 S.Ct. 236, 237, 72 L.Ed. 509 (1928). The status of Wright's flood loss claims was clearly "fixed" at the time of the loss by the regulations then in effect, and we can discern no intent for retroactive application of the 1988 October Amendment from its language or any other indications of FEMA's intent at the time of promulgation. *See Criger*, 902 F.2d at 1354.

The Supreme Court considered a case with facts very similar to this one in *Miller v. United States*, 294 U.S. 435, 55 S.Ct. 440, 79 L.Ed. 977 (1935). There, the Court was asked to give retroactive effect to an amended policy regulation under the War Risk Insurance Act whose broadened coverage included petitioner's injury, but was adopted eleven years after the petitioner's policy had lapsed, and nearly twelve years after the injury had occurred. The Court held the regulation inapplicable to the petitioner because it contained "nothing to suggest that it was to be given a retrospective effect so as to bring within its purview a policy which had long since lapsed and which had relation only to an alleged cause of action long since matured." 294 U.S. at 439, 55 S.Ct. at 441–42. The Court observed that where statutes or regulations have the effect of creating an obligation, the principle that statutes cannot be construed to operate retroactively absent unequivocal legislative intention is "strictly applicable." *Id.*

Like the Eighth Circuit in *Criger*, we believe that the Court's reasoning in *Miller* is fully applicable to Wright's attempt to give retroactive effect to the 1988 October Amendment, his claims having matured under a policy that expired two years before its being promulgated. We hold that the October 1, 1988 amendment of the elevated structure exclusion does not have retrospective effect.[18] Accordingly, we VACATE the order of the district court and

---

**16.** Not to mention the taxpayers.

**17.** The *Criger* court observed:

The technical rulemaking requirements do not alter the nature of the regulation: it is, in fact, a term of an insurance policy. If each new regulation was potentially effective to amend every SFIP ever written, whether or not the policies had expired, the result would be an administrative nightmare.
902 F.2d at 1354.

**18.** In light of this holding, we do not reach the issue of whether the district court erred in awarding post-judgment interest to plaintiff-appellee Wright.

REMAND the case for judgment in favor of the Director of FEMA.