Dewey T. WILEY, on behalf of himself and all others similarly situated, Plaintiff,

v.

EARL'S PAWN & JEWELRY, INC., Defendant.

Dewey T. WILEY, on behalf of himself and all others similarly situated, Plaintiff,

v.

EDDIE'S WHOLESALE JEWELRY & PAWN and Eddie's Wholesale Jewelry # 3, Defendants.

Civil Action Nos. 95–0195–CB–C, 95–0196–CB–C.

United States District Court, S.D. Alabama, Southern Division.

Jan. 9, 1997.

James E. Atchison, Mona A. Vivar, Mobile, AL, C. Knox McLaney, III, Montgomery, AL, for plaintiff.

James B. Newman, Mobile, AL, P. Russell Myles, Henry T. Morrissette, Mobile, AL, for defendants.

### ORDER

BUTLER, Chief Judge.

This matter is before the Court on motions for summary judgment filed by defendants Earl's Pawn & Jewelry, Inc., Eddie's Wholesale Jewelry & Pawn and Eddie's Wholesale Jewelry & Pawn # 3. After careful consideration of the motions, the briefs filed by the parties and the relevant evidence on file in light of the applicable law, the Court enters the following findings of fact and conclusions of law.

### Findings of Fact

On October 6, 1994, plaintiff Dewey T. Wiley pawned the title to his 1984 Toyota Tercel automobile at Eddie's Wholesale Jewelry & Pawn (Eddie's)[1] in exchange for $300. Wiley retained possession of the car while Eddie's took possession of the title. The pawn ticket which Wiley signed and received, states as follows:

CASH ADVANCED $300.00, WITH OPTION TO REDEEM ON OR BEFORE MATURITY DATE OF 11/06/94 FOR $375.00 OR RENEW FOR $75.00 FOR THIRTY DAYS. MONTHLY RATE: 25.00%. MONTHLY CHARGES: $75.00.

There was no annual percentage rate stated. On November 8, 1994, Wiley renewed the pawn transaction for another 30 days by paying the $75 renewal fee and $25 toward the principal. A new pawn ticket was issued with revised amounts and a new maturity date. Wiley renewed the transaction again on December 7, 1995, by paying the renewal fee plus an extra $5 toward the principal. Again, a revised pawn ticket was issued. Wiley failed to pay either the renewal fee or the redemption price by the January 9, 1995, due date. On January 19, 1995, Eddie's took possession of the car at a cost of $100. Wiley redeemed the vehicle from Eddie's on February 21, 1995, by paying the redemption amount plus accrued pawn charges.

On December 22, 1994, Wiley pawned the title to his 1985 Honda Accord to Eddie's in exchange for $400. As with the previous transaction, Wiley retained possession of the automobile while Eddie's took possession of the title. The pawn ticket Wiley signed stated:

CASH ADVANCED $400.00, WITH OPTION TO REDEEM ON OR BEFORE MATURITY DATE OF 01/23/95 FOR $400.00 OR RENEW FOR $100.00 FOR THIRTY (30) DAYS. MONTHLY RATE 25.00%. MONTHLY CHARGES: $100.00 ... APR 300.00%.

On February 18, 1995, Wiley redeemed the car title by paying the redemption amount plus accrued pawn charges. The pawn tickets Wiley received from Eddie's also contained the following language:

IN CONSIDERATION OF THEIR MUTUAL PROMISES AND OTHER GOOD AND VALUABLE CONSIDERATION THE PARTIES AGREE AS FOLLOWS: A PLEDGOR SHALL HAVE NO OBLIGATION TO REDEEM PLEDGED GOODS OR MAKE ANY PAYMENT ON A PAWN TRANSACTION ...

Wiley also entered into two pawn transactions with defendant Earl's Pawn & Jewelry, Inc. ("Earl's"). He pawned a ring on December 23, 1994, and a watch and a ring on February 13, 1995. The first pawn ticket recited the following terms:

---

1. The difference between Eddie's Wholesale Jewelry & Pawn and Eddie's Wholesale Jewelry and Pawn # 3 is not clear. As the parties appear to refer to these separate defendants collectively as "Eddie's", the Court will do likewise.

CASH ADVANCED $150.00 WITH OPTION TO REDEEM ON OR BEFORE MATURITY DATE OF 1/23/95 FOR $187.50. OR RENEW FOR $37.50 FOR THIRTY (30) DAYS. MONTHLY RATE: 25.00% MONTHLY CHARGES: 37.50.

The pawn ticket from the second transaction contained similar terms:

CASH ADVANCED $40.00, WITH OPTION TO REDEEM ON OR BEFORE MATURITY DATE OF 03/13/95 FOR $50.00. OR RENEW FOR $10.00 FOR THIRTY (30) DAYS. MONTHLY RATE: 25.00% MONTHLY CHARGES: 10.00

Wiley redeemed each of these pawns without renewing them.

### Conclusions of Law

*Procedural Background*

On March 13, 1995, plaintiff filed the instant actions against Earl's and Eddie's alleging that these defendants failed to make certain disclosures required by the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.* ("TILA") and Regulation Z, 12 C.F.R. §§ 226.1 *et seq.*, the regulation by which the Federal Reserve Board implements TILA. In addition, plaintiff has asserted a fraudulent suppression claim under state law based on defendants' failure to make the disclosures required under TILA. Plaintiff seeks class certification and has filed these actions on behalf of himself and on behalf of persons who have engaged in pawn transactions with Earl's and Eddie's.[2] The Court has consolidated the two actions for pretrial and discovery purposes.

*Summary Judgment Analysis*

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has satisfied his responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* at 1438 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must not weigh the evidence or make credibility determinations and must draw all inferences in favor of the nonmoving party." *Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 999 (11th Cir.1992), *cert. denied,* 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed.2d 657 (1993).

*Issues Raised*

All defendants have moved for summary judgment on the issue of liability. Defendants contend that they are entitled to summary judgment as to liability because TILA does not govern pawn transactions. If they were not required to make TILA disclosures, they could not be liable under TILA. Defendant Eddie's argue that it is not liable for fraudulent suppression based on failure to disclose TILA information since it was not required to disclose that information. Alternatively, Eddie's argues that plaintiff cannot satisfy other elements necessary to prove fraudulent suppression. Defendant Earl's does not raise the fraudulent suppression argument but does argue that it is entitled to partial summary judgment on the issue of actual damages under TILA.

*Analysis*

*Applicability of TILA*

■ The Court must first determine whether the pawn transactions at issue here are among the types of transactions TILA was designed to regulate. One of the primary purposes of TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more

---

**2.** The proposed class is broader with respect to Count II than it is as to Count I. In Count I, the plaintiff seeks to include only those persons who engaged in pawn transactions within one year prior to the date the suit was filed. The proposed class with respect to Count II includes persons who engaged in pawn transactions within the past six years prior to the filing date.

readily the various credit terms available to him and avoid the uninformed use of credit". 15 U.S.C. § 1610(a). "TIL[A] is a remedial statute that is to be liberally construed in favor of the consumer." *Cody v. Community Loan Corp.,* 606 F.2d 499, 505 (5th Cir.1979), *cert. denied,* 446 U.S. 988, 100 S.Ct. 2973, 64 L.Ed.2d 846 (1980). Due to the "complexity and variety" of credit transactions which "defy exhaustive regulation by a single statute", Congress "delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit." *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 560, 100 S.Ct. 790, 794, 63 L.Ed.2d 22 (1980). Hence, the Board has promulgated Regulation Z to "fill[ ] the statutory gaps." *Id.; see also* 15 U.S.C. § 1604 (delegating to Board power to "prescribe regulations to carry out the purposes of this subsection").

■ Defendants argue that they are not required to make TILA disclosures because pawnbrokers in Alabama do not extend credit. TILA defines credit as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(e). Neither TILA nor Regulation Z defines the word "debt". Defendants, citing various dictionary definitions, contend that a debt must be accompanied by an obligation to repay. They argue that there is no debt because the Alabama Pawnshop Act, Ala.Code §§ 5–19A–1 *et seq.* (1996 Repl.Vol.) imposes no obligation on a pledgor "to redeem pledged goods or make any payment on a pawn transaction." *Id.* § 5–19A–6.

■ Defendants' contention that pawnbrokers are not subject to TILA is in conflict with the Federal Reserve Board's recently adopted amendment to its official staff commentary to Regulation Z. The revised commentary states that "[w]hen, in connection with an extension of credit, a consumer pledges or sells an item to a pawnbroker creditor in return for a sum of money and retains the right to redeem the item for a greater sum (the redemption price) within a specified period of time, disclosures are required." 61 Fed.Reg. 14952 (amending Regulation Z, Supplement I—Official Staff In-

terpretations, 12 C.F.R. § 226.18 (1996)) ("Revised Commentary"). The Court is bound to follow the official staff interpretations of Regulation Z unless they are "demonstrably irrational". *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980).

■ Defendants contend that the Revised Commentary is not applicable because it was enacted after the incidents giving rise to these claims. An agency rule which clarifies an unsettled area of law does not change the law; therefore, it may be applied to claims arising before its effective date. *Pope v. Shalala,* 998 F.2d 473, 483 (7th Cir.1993); *Smith v. Highland Bank,* 915 F.Supp. 281, 286–87 (N.D.Ala.1996) (applying clarifying amendment to Commentary to Regulation Z enacted after claim arose). Moreover, an agency's determination that an amendment clarifies, rather than changes, the law is given great deference. *Wright v. FEMA,* 913 F.2d 1566, 1571 (11th Cir.1990). In this case, the summary to the Revised Commentary states that the Commentary "applies and interprets the requirements of Regulation Z" and that the revisions "provide guidance" on certain issues addressed therein. 61 Fed. Reg. 14952. Moreover, for reasons discussed more specifically below, the Board's interpretation applying TILA and Regulation Z to pawnbrokers is in accordance with the prevailing law. Therefore, the Revised Commentary applies to the case at hand unless it is demonstrably irrational.

The Board's application of TILA to pawnbrokers is not demonstrably irrational. Although few courts have addressed the issue, those which have uniformly hold that pawnbrokers are subject to TILA. *See Burnett v. Ala Moana Pawn Shop,* 3 F.3d 1261 (9th Cir.1993) (holding TILA applies to pawnbrokers); *Hyde v. Hutto Enterprises, Inc.,* 1994 WL 653504 (M.D.Ala.1994) (same); *Dennis v. Handley,* 453 F.Supp. 833 (N.D.Ala.1978) (same); *see also Pendleton v. American Title Brokers, Inc.,* 754 F.Supp. 860 (S.D.Ala.1991) (applying TILA to pawnbroker without discussion). In *Burnett,* the Ninth Circuit found that a pawn transaction which the pawn ticket denominated as a sale with the option to repurchase was, in truth, "a loan

secured by property, regardless of whether [the plaintiff] was personally liable for the debt" and, therefore, was credit governed by TILA. *Burnett,* 3 F.3d at 1262. In so doing, the court recognized that it is necessary to "look[ ] past the form of the transactions to their economic substance in deciding whether [TILA] applie[s]." *Id.*

Not only are defendants attempts to distinguish Alabama pawn transactions from the above-cited cases unavailing, they fall far short of demonstrating that the Federal Reserve Board's application of TILA to pawnbrokers is irrational. The lack of a legally enforceable obligation to repay does not transform a pawn transaction into something other than credit. The term "debt" may be defined in several ways. Defendants focus on those definitions which include an "obligation to repay" and presume that such an obligation must be a legal one. However, debt may also be defined as "that which is due from one person to another, whether money, goods, or services[ ]". Black's Law Dictionary (5th ed.). Since TILA is to be construed liberally in favor of the consumer, *see Cody,* 606 F.2d at 505, the more expansive definition of debt should be applied.

Defendant Eddie's alternatively argues, relying on *Burnett,* that the transactions at issue here were sales rather than loans. Among the factors the *Burnett* court considered in determining that the pawn transaction was actually a loan was the amount of cash advanced versus the fair market value of the item. Of course, the Federal Reserve Board's post-*Burnett* interpretation of Regulation Z makes no distinction in pawn transactions. According to the Board, TILA applies whether the consumer "pledges or sells an item to a pawnbroker creditor". 61 Fed. Reg. 14952 ¶ 18(i).

■ Even if there were a distinction in pawn transactions, defendant's argument is without merit. Eddie's contends that because it paid fair market *pawn* value, this transaction was not a loan. As defendant recognizes in its brief, the pawn value of the vehicles in question is substantially less than the actual fair market value.[3] "[When] [t]he amount of cash accepted [is] far less than the property's fair market value, [there is] a strong incentive to 'repurchase' the property." *Burnett,* 3 F.3d at 1262. Thus, the transaction takes on all the characteristics of a loan, with "[t]he difference between the amount advanced and the repurchase price constitut[ing] a 'finance charge.' " *Id.*

■ Finally, it is rational to apply TILA uniformly to pawnbrokers in all states. It would be anomalous if, as defendants suggest, a state could exempt its pawnbrokers from TILA by legislative fiat. Moreover, "[t]he applicability of TILA ... depends on the words of the statute interpreted in light of the purposes of the act, and not on whether a particular transaction is enforceable under state law." *Dryden v. Lou Budke's Arrow Finance Co.,* 630 F.2d 641, 646 (8th Cir.1980). *See also Cody,* 606 F.2d at 505 (state law has nothing to do with how transaction is to be characterized for TILA purposes).

### *Fraudulent Suppression*

■ Defendant Eddie's has also moved for summary judgment as to plaintiff's fraudulent suppression claims. In his complaint, plaintiff contends that the defendants committed the state law tort of fraudulent suppression by failing to make the required TILA disclosures. Plaintiff does not address this issue in his response to the motions for summary judgment. According to the Report and Recommendation of the Magistrate Judge, this claim was dismissed with prejudice at the evidentiary hearing on the motion for class certification. *See* Rept. & Rec. dated June 14, 1996 p. 2, n. 2. The Court will, therefore, dismiss plaintiff's fraudulent suppression claim.[4]

---

**3.** According to Eddie's, the Honda had a "straight sale fair market value of $1,000 to $1,200" and a "pawn fair market value of $400". Eddie's Brf. at p. 15. The Toyota had a "straight fair market value of $1,000" and a "pawn value of $300". *Id.*

**4.** Apparently, plaintiff overlooked this fact when filing his objection to the motion for class certification. In his objection, plaintiff states that one of the issues involved is whether defendants engaged in fraudulent suppression. Pltf.'s Obj. p. 2. Based on the Report and Recommendation, the Court considers the claim to be dismissed.

### Actual Damages

■ Defendant Earl's has moved for partial summary judgment as to: (1) the method of calculating of actual damages and (2) whether Wiley himself incurred actual damages. TILA permits recovery of both actual and statutory, or liquidated, damages. 15 U.S.C. § 1640(a)(1) and (2)(B). The statute neither defines nor sets out a method for determining actual damages. Defendant contends that in order to prove actual damages, a debtor must prove that he relied to his detriment on the financing terms set out by the defendant. Plaintiff argues that detrimental reliance is not necessary and that the measure of actual damages is simply the amount of the undisclosed finance charge imposed on each class member.

Defendant's position is supported by the great weight of authority and is, in the Court's opinion, the better reasoned view. *See Romaker v. Crossland Mortgage Corp.,* 1996 WL 254299 (N.D.Ill.1996); *Adiel v. Chase Federal Svgs. & Loan,* 630 F.Supp. 131 (S.D.Fla.1986), *aff'd,* 810 F.2d 1051 (11th Cir.1987); *McCoy v. Salem Mortgage Co.,* 74 F.R.D. 8 (E.D.Mich.1976); *see also Bambilla v. Evanston Nissan, Inc.,* 1996 WL 284954, *5 (N.D.Ill.1996) (since wrong is failing to disclose, rather than the amount charged, "damages must be limited to those flowing from what was failed to be disclosed"). "The legislative history of the Act indicates that Congress was aware of the difficulty of es-

tablishing that causal link between the financing institution's noncompliance with the Act and the Plaintiffs' purported damages. Court's have not only commented on this obstacles, but have also construed it to be the very impetus behind the legislative decision to construct a workable scheme of statutory damages." *Adiel,* 630 F.Supp. at 134. As one court succinctly noted, "if actual damages could be computed by a simple formula, no statutory damage provision would have been necessary." *McCoy,* 74 F.R.D. at 12.

■ The above-cited cases are in accordance with the usual definition of actual damages. Actual damages are synonymous with compensatory damages and are awarded "in compensation for actual or real loss or injury." *Black's Law Dictionary* p. 352 (5th ed. 1979). Such damages "make good or replace the loss caused by the wrong or injury." *Id.* Unless a person can prove that he would have gotten a better interest rate or, perhaps, foregone the loan altogether, he has suffered no actual loss.

Plaintiff cites several cases in support of his claim that actual damages are equal to the amount of the undisclosed interest rate and require no proof of detrimental reliance. However, only one of those cases, *In re Russell,* 72 B.R. 855 (Bankr.E.D.Pa.1987), actually squarely addresses the issue.[5] In *Russell,* the bankruptcy court held that "actual damages arise whenever a disclosure

---

In any event, plaintiff has failed to respond to Eddie's fraudulent suppression argument and has, therefore, failed to meet its burden on summary judgment. To recover for fraudulent suppression, a plaintiff must prove (1) that the defendant had a duty to disclose a material fact, (2) that the defendant concealed or failed to disclose this fact, (3) that the defendant's failure to disclose this material fact induced the plaintiff to act or refrain from acting, and (4) that plaintiff suffered actual damage as a proximate result. Ala.Code § 6–5–102 (1975). By failing to respond to the motion for summary judgment on this claim, plaintiff has failed to show the existence of a genuine issue of material fact, at least as to the two latter elements of fraudulent suppression.

5. The remaining cases cited do not necessarily approve the proposition set forth by plaintiff. For instance, in *Goldman v. First Nat'l Bank of Chicago,* 532 F.2d 10, 15 (7th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 183, 50 L.Ed.2d 150

(1976), the court simply refers, in *dicta,* to an earlier case in which there had been allegations of actual damages which included a finance charge and an interest rate. Two of the cases cited by plaintiff, *First Acadiana Bank v. FDIC,* 833 F.2d 548 (5th Cir.1988), and *Sentinel Federal Svgs. & Loan v. Office of Thrift Supervision,* 946 F.2d 85 (8th Cir.1991), do not involve the statute at issue. Instead, those cases arise from 16 U.S.C. § 1607 which authorizes administrative enforcement of TILA by government agencies such as the FDIC and the OTS. Section 1607(e)(1) specifically authorizes such agencies to require the creditor to adjust the account of the borrower "to assure that such person will not be required to pay a finance charge in excess of the finance charge actually disclosed or the dollar equivalent of the annual percentage rate actually disclosed." *Id. In re Stewart,* 93 B.R. 878 (Bankr.E.D.Pa.1988), which was decided by the same judge who decided *Russell,* simply follows the *Russell* decision.

statement contains a substantial violation, as opposed to a mere technical violation, and that damages should be measured by the magnitude of the violation." *Id.* at 863. In that case, the court went on to hold that the measure of actual damages was the amount of undisclosed finance charges. One set of commentators has called *Russell* a "radical departure from established Truth in Lending case law." D. Edwin Schmelzer & Robert P. Chamness, *Truth in Lending Developments in 1987: An Active Year on Several Fronts,* 43 Bus.Law 104, 1067 (1988). Because plaintiff relies heavily on *Russell,* the Court finds it necessary to dissect the reasoning underlying that decision.

The *Russell* court gave three grounds for its unusual definition of actual damages, none of which is persuasive. First, the court relied on the remedial nature of TILA and "analogous federal Securities Exchange Act and Anti–Trust Act disclosure-violation cases" wherein, according to *Russell,* the Supreme Court held that a plaintiff need not show detrimental reliance to recover damages for nondisclosure. *See Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (discussing securities violation) and *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (discussing price-fixing violation of anti-trust law). However, in neither of these cases did the Supreme Court abandon the concept that actual damages are those which flow directly from the violation.

In *Mills* the Court held that plaintiffs need not prove that each shareholder actually relied on the misstatement or omission in a proxy statement in order to prove a *violation* of the Securities Act. Instead, it was sufficient to show that the misstatement or omission was material. In discussing *damages,* however, the Court did not abandon the concept that there must be some additional proof of actual damages:

> Monetary relief will, of course, also be a possibility. Where the defect in the proxy solicitation relates to the specific terms of the merger, the district court might appropriately order an accounting to ensure that the shareholders receive the value that was

represented as coming to them. On the other hand where, as here, the misleading aspect to the solicitation did not relate to terms of the merger, monetary relief might be afforded to the shareholders only if the merger resulted in a reduction of the earnings or earnings potential of their holdings. In short, *damages should be recoverable only to the extent that they can be shown.*

*Id.* at 388, 90 S.Ct. at 623.

*Story* provides even less support for the *Russell* court's decision. That case involved a company's action against three competitors who were engaged in a price-fixing conspiracy. The appellate court held that plaintiff could not recover for lost profits because there was insufficient evidence that the prices would have been higher had there been no conspiracy. The Supreme Court reversed, holding that although there was uncertainty as to the extent of the damage, there was no uncertainty as to the fact of the damage and that there was sufficient evidence to determine damages, even though the amount was only approximate. *Story,* 282 U.S. at 562–63, 51 S.Ct. at 250–51. Again, the Court recognized the general rule that "all damages resulting necessarily and immediately and directly from the breach are recoverable, and not those that are contingent and uncertain." *Id.* at 563, 51 S.Ct. at 250.

The *Russell* court also relied upon a 1980 amendment to TILA as support for the idea that undisclosed finance charges as actual damages, regardless of the consumer's reliance. As a result of that amendment, § 1640(b) provides a method whereby a creditor may escape liability under TILA if, within sixty days of discovering an error in its disclosures, it notifies the consumer of the error and makes an adjustment in that person's account so that the consumer is not required to pay an amount in excess of the finance charge or dollar amount of the annual percentage rate disclosed. According to *Russell,* this incentive to correct errors is lost unless the creditor is faced with the possibility that the consumer will not have to pay the excess finance charge in any event.

It is true, as *Russell* and the plaintiff in the instant case suggest, that the incentive to correct errors decreases in inverse proportion to the magnitude of the error. For instance, if a company with a net worth of $1 million discovers that it failed to disclose a $2 finance charge to 2,000 consumers, it is economically ·advantageous for the company to inform its customers of the error and to rebate the money to each account, at a cost of $4,000 to the company. Otherwise, the company would face litigation costs, statutory and any actual damages proven. On the other hand, if the excess finance charge were $2,000 to each of 2,000 customers, the company's financial incentive to correct its error decreases. It would cost the company $4 million dollars to refund the excess finance charges. While the company would still run the risk of litigation which would result in statutory damages, attorney's fees and any actual damages that could be proven, it might stand to lose less than if it corrected its error. Actual damages based on detrimental reliance are difficult to prove, and statutory damages in a class action are limited to the lesser of $500,000 or 1 percent of the creditor's net worth. *See* 15 U.S.C. § 1640(a)(2)(B). On the other hand, if the undisclosed finance charge were imposed in any event, there would always be a greater incentive to correct the error than to remain silent since costs, attorney's fees and statutory damages would be imposed on top of the undisclosed finance charges. *See* 15 U.S.C. § 1640(a)(3) (attorney's fees and costs recoverable in successful TILA action).

Although these scenarios point out an anomalous result, it does not necessarily follow that Congress intended to give the term "actual damage" a meaning different from its ordinary meaning. If Congress had intended that the creditor should refund the undisclosed finance charge as part of the damages imposed, it could easily have said so, as it has done elsewhere in TILA. As noted earlier, that is the remedy specifically prescribed in § 1640(b). Furthermore, in § 1607, the administrative enforcement provision, Congress has given agencies the authority to require the creditor "to make an adjustment to [a consumer's] account to assure that such person will not be required to pay a finance charge in excess of the finance charge actually disclosed or the dollar equivalent of the annual percentage rate actually disclosed." 15 U.S.C. § 1607(e)(1). Notably, that authority may be invoked only where the error resulted from a clear and consistent practice of violations, gross negligence or a willful violation. 15 U.S.C. § 1607(e)(2). Thus, it can be argued that Congress intended blanket refunds of undisclosed finance charges only in egregious circumstances.

Finally, *Russell* points to language in cases which "suggests" that it is unnecessary for consumers to prove detrimental reliance in order to recover actual damages. *Russell,* 72 B.R. at 864. The most troublesome of these cases is one from the Eleventh Circuit, *Ransom v. S & S Food Center,* 700 F.2d 670, 677 (11th Cir.1983).[6] In *Ransom* the appellate court upheld, without any discussion or citation to authority, the trial court's decision to allow as actual damages, "the additional finance charge paid by each class member which exceeded the legally permissible finance charge." *Id.* at 677.

For several reasons this Court does not consider *Ransom* binding authority for the proposition that actual damages should be measured simply by the amount of undisclosed finance charges. First, there is no discussion of the issue in that case. Second, it is not at all clear that the undisclosed charges were awarded to every class member

---

**6.** The other cases relied upon by *Russell* are easily distinguished. One of these cases, *Goldman v. First Nat'l Bank of Chicago,* has been discussed and distinguished, *supra* at p. 1114, n. 5. In the other, *Eovaldi v. First Nat'l Bank of Chicago,* 71 F.R.D. 334 (N.D.Ill.1976), *rev'd,* 596 F.2d 188 (7th Cir.1979), the court developed an alternative method for determining actual damages because it believed that proving detrimental ·reliance would be too difficult due to the number of class members and the passage of time. In that case, the violation was defendant's failure to send out a timely bill which resulted in late payments and additional finance charges. The court did not order a blanket refund of all excess finance charges as actual damages (which is the equivalent of what plaintiff in this case would have· this court do). Rather, the court relied on expert testimony to approximate the number of finance charges that would and would not have been timely paid if bills had been sent.

in *Russell*, as one portion of the opinion states that "[i]t was therefore clearly appropriate for the trial court to require a payment to each of the *named members* of the class of a cash amount that would offset their outstanding obligations which would otherwise remain collectable against them." *Id.*

Finally, a subsequent Eleventh Circuit decision leaves doubt with regard to *Ransom*'s authority on this issue. In *Adiel v. Chase Fed.Svgs. & Loan Ass'n*, 630 F.Supp. 131 (S.D.Fla.1986), *aff'd*, 810 F.2d 1051 (11th Cir. 1987) the district court specifically held that plaintiffs must prove detrimental reliance in order to recover actual damages. On appeal, the circuit court did not directly address the detrimental reliance issue; however, it did hold that the district court did not err in awarding an amount equal to the undisclosed finance charges as statutory rather than actual damages.[7] *Id.* at 1054–55. If *Ransom* were clear authority, then the appellate court would have been wrong to hold as it did in *Adiel.*

 Having determined that actual damages require proof of detrimental reliance, the Court must consider whether Wiley has met his burden of proving that he did actually rely on defendant's failure to make the appropriate TILA disclosures. Defendant Earl's points out that the violation alleged against it is that the form of disclosure was incorrect. The monthly finance charge was disclosed on the form, and Wiley admits that he was aware that he was paying a monthly charge of 25%. Plaintiff evidently relies solely on his legal argument that proof of detrimental reliance is not necessary, as he has filed no evidence in opposition to the summary judgment motion that would put the detrimental reliance issue in dispute. Accordingly, the Court finds that Earl's is entitled to summary judgment on the issue of the named plaintiff's actual damages.

### Conclusion

In conclusion, the Court finds that the Truth in Lending Act applies to Alabama pawnbrokers. Therefore, the motions for summary judgment are **DENIED, in part,**

insofar as defendants seek judgment as a matter of law on plaintiff's TILA claims. Pursuant to plaintiff's stipulation before the Magistrate Judge, plaintiff's fraudulent suppression claim is hereby **DISMISSED with prejudice.** Defendant Earl's motion for summary judgment is **GRANTED, in part,** on the issue of actual damages. Plaintiff Wiley has failed to prove that he is entitled to recover actual damages.

It is so **ORDERED.**

---

7. The characterization of the undisclosed finance charges as actual, as opposed to statutory, dam-

ages was important for the purpose of recovering prejudgment interest. *Adiel*, 810 F.2d at 1055.